2013-1168

# United States Court of Appeals
## *for the* FEDERAL CIRCUIT

---

### UNITED STATES,

**Plaintiff-Appellee,**

*v.*

### C.H. ROBINSON COMPANY,

**Defendant-Appellant.**

---

Appeal from the United States Court of International Trade,
Case No. 06-CV-0434, Judge Leo M. Gordon

---

## BRIEF OF DEFENDANT-APPELLANT, C.H. ROBINSON COMPANY

---

John M. Peterson
*Counsel of Record*
Richard F. O'Neill
NEVILLE PETERSON LLP
17 State Street, 19th Floor
New York, NY 10004
Tel: (212) 635-2730
Fax: (212) 635-2734
jpeterson@npwny.com
roneill@npwny.com

April 17, 2013

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

United States v. C.H. Robinson Company

No. 13-1168

CERTIFICATE OF INTEREST

Counsel for Petitioner U.S. v. C.H. Robinson Company certifies the following:

1)      The full name of every party or amicus represented by me is:

United States v. C.H. Robinson Company

2)      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

None

3)      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None

4)      The name of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

John M. Peterson (Partner) and Richard F. O'Neill (Associate) of the law firm of Neville Peterson LLP

Respectfully submitted,

Dated:        January 30, 2013                  /s/ Richard F. O'Neill
                                                Richard F. O'Neill

# **TABLE OF CONTENTS**

CERTIFICATE OF INTEREST ............................................................... ii

TABLE OF CONTENTS ...................................................................... iii

TABLE OF AUTHORITIES ................................................................. iv

STATEMENT OF RELATED CASES .....................................................v

STATEMENT OF JURISDICTION ........................................................1

STATEMENT OF THE ISSUE ..............................................................1

STATEMENT OF THE CASE ...............................................................2

STATEMENT OF FACTS ....................................................................4

SUMMARY OF THE ARGUMENT .....................................................15

ARGUMENT ....................................................................................19

    I.   Standard of Review .............................................................19

    II.   The Court Unlawfully Expanded C.H. Robinson's Legal Obligations Beyond Those Specified in the Relevant Laws and Regulations. .......................19

       A.   Neither the Statute nor Regulations Requires Exportation Under the T&E Entry. .............................................................24

       B.   Events Occurring After Proper Delivery Cannot Be Attributable to the Bonded Carrier. .............................................................28

       C.   Delivery of Goods to the District Director Constituted Satisfaction of C.H. Robinson's Obligations Under Its Carrier Bond and the T&E Entries in This Case ...............................................31

    III.   The Lower Court Erred in Holding that Mere "Suspicion" of Non-Exportation Shifted the Burden of Persuasion to the Defendant. .......................36

    IV.   The Remedy That the Government Sought Required a Highly Specific Factual and Legal Showing. ...............................................41

CONCLUSION .................................................................................43

CERTIFICATE OF SERVICE .............................................................44

CERTIFICATE OF COMPLIANCE......................................................45

U.S. COURT OF INTERNATIONAL TRADE JUDGMENT AND SLIP OPINION 12-134 ..............................................................................46

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Alaska Airlines, Inc. v. Johnson*, 8 F.3d 791 (Fed. Cir. 1993) ................................29

*C.H. Robinson Int'l v. United States*, 64 Fed. Cl. 651 (2005) ...................................7

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979).......................................................21

*Crofton Ventures L.P. v. G&H P'ship*, 258 F.3d 292 (4th Cir. 2001)....................40

*Davis-Lynch v. Moreno*, 667 F.3d 539 (5th Cir. 2012) .................................... 38, 40

*Fla. Sugar Mktg. and Terminal Ass'n, Inc. v. United States*, 220 F.3d 1331 (Fed. Cir. 2000) ....................................................................................................20

*Forest Prods. Nw. Inc. v. United States*, 62 Fed. Cl. 109 (2004) ...........................42

*Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368 (Fed. Cir. 2005) ............38

*Indem. Ins. Co. of N. Am. v. Hanjin Shipping Co.*, 348 F.3d 628 (7th Cir. 2003)............................................................................................................. 32, 33

*Jacob Blinder & Sons v. Gerber Products Co.*, 166 F.3d 112 (3d Cir. 1999) ........40

*Jazz Photo Corp. v. United States*, 439 F.3d 1344 (Fed. Cir. 2006) ................ 29, 37

*United States v. Bennett*, 621 F.3d 1131 (9th Cir. 2010)........................................39

*United States v. C.H. Robinson Co.*, 880 F. Supp. 2d 1335 (Ct. Int'l Trade 2012) ................................................................................................................ passim

*United States v. Delgado*, 672 F.3d 320 (5th Cir. 2012) ........................................38

*United States v. Dinkane*, 17 F.3d 1192 (9th Cir. 1994) ........................................39

*United States v. Dreyfus-de Campos*, 698 F.2d 227 (5th Cir. 1983) ......................34

*United States v. Ford Motor Co.*, 463 F.3d 1286 (Fed. Cir. 2006) ........................19

*United States v. Garcia*, 673 F.2d 1349 (11th Cir. 1982)......................................34

*United States v. Hitachi Am., Ltd.*, 172 F.3d 1319 (Fed. Cir. 1999) ......................19

*United States v. Lindsay*, 634 F.3d 541 (9th Cir. 2011) .........................................39

*United States v. Mead Corp.*, 533 U.S. 218 (2001) .................................................21

*United States v. Reyna*, 572 F.2d 515 (5th Cir. 1978).............................................34

*United States v. Strmel*, 574 F. Supp. 793 (E.D. La. 1983) ...................................34

## Statutes & Regulations

5 U.S.C. § 706 ..................................................................................................21

19 C.F.R. § 18.4 ...............................................................................................25

19 C.F.R. § 18.7 ...................................................................................... 6, 7, 31

19 C.F.R. § 18.8 .......................................................................................... passim

19 U.S.C. § 1553 ......................................................................................... passim

19 U.S.C. § 1592 ........................................................................................ 7, 42

19 U.S.C. § 1618 ..............................................................................................7

**Agency Decisions**

*Customs Headquarters Ruling 562093* (Jun. 22, 2001) .........................................39

*Customs Headquarters Ruling H082576* (Jan. 18, 2012)......................................39

**Rules**

U.S. Ct. Int'l Trade R. 26.......................................................................................9

**Miscellaneous**

GAO Report 04-345 to Congressional Committees, *International Trade—
U.S. Customs and Border Protection Faces Challenges in Addressing
Illegal Textile Transshipment* (Jan. 2004)...........................................................31

## STATEMENT OF RELATED CASES

In accordance with Rule 47.5 of the U.S. Court of Appeals for the Federal
Circuit (CAFC), counsel for Defendant-Appellant, C.H. Robinson Company
("C.H. Robinson"), hereby states that no other appeal in or from this civil action in
the lower court was previously before this or any other appellate court, nor is any
case known to counsel to be pending in this or any other court that will directly
affect or be directly affected by this Court's decision in this appeal.

## STATEMENT OF JURISDICTION

This appeal is from a final decision of the U.S. Court of International Trade (CIT) dated November 20, 2012.  Appellant timely filed in the lower court a notice of appeal on January 16, 2013.  This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1295(a)(5) (1999).

## STATEMENT OF THE ISSUE

I.     Whether the lower court erred, as a matter of law, in pronouncing that the burden of proof under section 553 of the Tariff Act of 1930, 19 U.S.C. § 1553, and section 18.8(c) of the U.S. Customs and Border Protection ("CBP" or "Customs") Regulations, 19 C.F.R. § 18.8(c), permitted Plaintiff-Appellee, the United States (the "Government"), to satisfy its burden of persuasion by demonstrating that either: (i) the subject merchandise was "missing" at the time of delivery to the District Director at the port of destination pursuant to the terms of the relevant Transportation & Exportation entries; *or* (ii) the merchandise was not exported as required, regardless of whether "delivery" was made under the terms of the entries.

II.     Whether the Government stated a sufficient claim of "shortage, irregular delivery, or nondelivery at the port of destination or exportation" under 19 U.S.C. § 1553 and 19 C.F.R. § 18.8(c) by alleging that "[t]he merchandise was

not exported into Mexico," (Compl. ¶ 11) (*JA 44*), and that "C.H. Robinson has not provided adequate assurance that the three shipments of merchandise were properly exported and has refused to pay the duties, taxes, and fees owed as a result of the merchandise not being exported," (Compl. ¶ 31) (*JA 47*).

## STATEMENT OF THE CASE

This appeal is taken from *United States v. C.H. Robinson Co.*, 880 F. Supp. 2d 1335 (Ct. Int'l Trade 2012) (the "*Opinion*" or "*Slip Op.*") (*JA 1-24*), which was commenced by the Government to recover duties, taxes, and fees pursuant to 19 U.S.C. § 1553 and 19 C.F.R. § 18.8(c) on allegedly "missing" merchandise involving Transportation and Exportation ("T&E") entries of which C.H. Robinson was the bonded carrier.  (*JA 40–42*).  The T&E Entries at issue in this case covered merchandise which was entered at the Port of Los Angeles, California, in 2001 and directed the bonded carrier to transport and to deliver the same to the District Director of Customs at the Port of Laredo, Texas.

Although the CIT's decision held that C.H. Robinson "fulfilled its obligations under 19 C.F.R. § 18.8 by providing acceptable proof of proper delivery of the subject merchandise at the Port of Laredo[,]" it required further that the bonded carrier not only certify proper delivery, but also that it "account for 'missing merchandise.'"  (*Slip Op.* at 7) (*JA 7*).  Specifically, the CIT held, that "it

2

is more probable than not that the subject merchandise was not exported, as required by statute and regulation.  Consequently, pursuant to 19 U.S.C. § 1553 and 19 C.F.R. § 18.8(c), C.H. Robinson is liable for 'any internal-revenue taxes, duties, or other taxes accruing to the United States' on the missing subject merchandise in the amount of $106,407.86." (*Slip Op.* at 23) (*JA 23*).

C.H. Robinson submits that the CIT committed reversible legal error by requiring that a bonded carrier "has a duty to ensure that the subject merchandise was timely exported out of the United States or lawfully entered into U.S. commerce or warehouse." (*Slip Op.* at 21) (*JA 21*).  C.H. Robinson's sole legal responsibility as the bonded carrier was to deliver the merchandise to the District Director of Customs at the Port of Laredo, Texas.  By obtaining stamped copies of the CF 7512 in-bond documents, which constitute "acceptable proof of proper delivery of bonded merchandise," C.H. Robinson fulfilled its obligations under the unambiguous terms of the bond.  The Government's sole allegation in its Complaint claims that C.H. Robinson did not provide adequate assurance that the in-bond merchandise was exported.  (Compl. ¶ 31) (*JA 44*).  The regulation, however, only imposes liability for duties when there is a "failure to make the required transportation, report, and delivery."  19 C.F.R. § 18.8(c).  The Court erred in holding that the Government merely needed to "cast enough suspicion over the exportation/non-exportation of the merchandise for the fact-finder to

3

conclude that the merchandise was not exported," to meet its burden of proof. *See* Order, *United States v. C.H. Robinson*, No. 06-434, at 3 (Ct. Int'l Trade Jan. 14, 2010) ("Order 2010") (*JA 55*)

This error alone warrants reversal of the decision below. However, the CIT also erred in finding that the Government's proffer of purely circumstantial evidence sufficient to establish by a preponderance of the evidence, that C.H. Robinson is liable for unpaid duties on the subject entries.

## STATEMENT OF FACTS

In December 2001, three shipments of imported wearing apparel (the "subject merchandise") which had arrived at the Port of Los Angeles, California, were tendered to defendant C.H. Robinson, a Customs-bonded carrier, under cover of three (3) Customs Form (CF) 7512 T&E Entries, numbered 609.203.744, 609.203.873, and 609.203.862 (hereinafter, the "T&E Entries" or "7512s") (*JA 40-42*). The T&E Entries identified Trans-Union Group Inc./Intercambio Comercial PKIM S.A. ("TUG"), a freight forwarder, as the importer and designated C.H. Robinson to transport the subject merchandise in-bond from the Port of Los Angeles/Long Beach, California, to the District Director of Customs at the Port of Laredo, Texas. The T&E Entries by their terms consigned the goods to the

"District Director of Customs at Laredo, Texas (2304)," explicitly requiring that the goods were to be delivered to the District Director of Customs—



(*See* T&E Entries) (*JA 40-42*) (emphasis added).  Farther down the page of the T&E Entries are similar delivery instructions:



(*JA 40-42*) (emphasis added).

C.H. Robinson engaged Mario's Transports, Inc. ("Mario's")[1] to transport the goods covered by the T&E Entries.  The merchandise was, in fact, transported from Los Angeles, California, arriving at the office of the District Director between January 2 to 4, 2002.  Upon delivery of the goods, the carrier received from Customs stamped copies of each CF 7512 entry (*JA 40-42*); which copies,

--------------------------

[1] C.H. Robinson is a non-asset-based carrier, which engages asset-owning carriers to transport goods on its behalf.

5

under Customs' regulations, constitute "[a]n acceptable proof of proper delivery of bonded merchandise to Customs at the port of destination or exportation." 19 C.F.R. § 18.8(a). The receipt of the stamped CF 7512s acknowledged completion of delivery and terminated the bonded transportation and all liabilities thereunder.

Weeks after the delivery of the goods, Customs conducted a post-exportation audit of the subject T&E Entries. As part of this audit Customs requested that C.H. Robinson submit proof of exportation of the subject merchandise. Although C.H. Robinson was only contracted to take the goods to Laredo, Texas (*see* T&E Entries) (*JA 40-42*); (Tr. 480:3-5, Munoz cross) (*JA 100*), and did not transport the goods into Mexico,[2] it contacted TUG, the shipper, which provided copies of Mexican import *Pedimentos* (Mexican customs entries),[3] which C.H. Robinson forwarded to Customs. While C.H. Robinson's obligations under its bond terminated upon delivery, as the bonded carrier it was willing to aid in Customs' investigation as to the ultimate destination of the goods even though it was not the "exporting carrier" under 19 C.F.R. § 18.7(c).[4]

---

[2] The evidence shows that, at all relevant times, United States carriers were prohibited from transporting goods to Mexico (Tr. 486:10–487:4, Munoz cross) (*JA 101-102*)

[3] TUG provided *Pedimento* No. 02-24-3065-2000079 for T&E Entry No. 609.203.744; *Pedimento* No. 02-24-3065-2000025 for T&E Entry No. 609.203.873; and *Pedimento* No. 02-24-3065-2000010 for T&E Entry No. 609.203.862 (hereinafter, collectively, the "subject *Pedimentos*").

[4] Section 18.7(c) of Customs' Regulations, 19 C.F.R. § 18.7, provides—

6

In 2002, Customs issued three (3) claims for liquidated damages penalties against C.H. Robinson, each in the amount of its $25,000 bond, for allegedly misdelivering merchandise in violation of 19 U.S.C. § 1553, and 19 C.F.R. § 18.8(c).  In accordance with 19 U.S.C. § 1618, C.H. Robinson filed initial and supplemental petitions for remission or mitigation of the claims. Laredo Customs responded to C.H. Robinson's supplemental petition on November 20, 2003 and agreed to mitigate the penalties from $75,000 to $57,212.00.  The Court of Federal Claims (CFC) subsequently ruled that the mitigated assessments were excessive, and could not, collectively, exceed the $25,000 limit of C.H. Robinson's bond. *C.H. Robinson Int'l v. United States*, 64 Fed. Cl. 651 (2005) (*JA 58*).

Following the CFC's decision, and more than four years after the alleged "misdelivery" of merchandise, the Government issued to C.H. Robinson a document styled as a "Demand for Payment of Duty," dated July 22, 2005, in the amount of $106,407.86, under claimed authority of 19 U.S.C. § 1592(d).  C.H.

---

(c) Whenever the circumstances warrant, and occasionally in any event, port directors shall request the Office of Enforcement to check export entries and withdrawals against the records of the exporting carriers. Such check or verification shall include an examination of the carrier's records of claims and settlement of export freight charges and any other records which may relate to the transaction. The exporting carrier shall maintain these records for 5 years from the date of exportation of the merchandise.

C.H. Robinson was not the "exporting carrier" for the subject merchandise, and the Mexican import *Pedimentos* were not its records. C.H. Robinson undertook to obtain the *Pedimentos* from TUG.

Robinson filed petitions challenging the legitimacy of Customs' claim, and Customs abandoned its efforts to collect duties under § 1592. After apparently abandoning the § 1592 claim, however, Customs issued another Demand for Payment of Duty, dated September 21, 2006, under claimed authority of 19 U.S.C. § 1553 and 19 C.F.R. § 18.8(c), also seeking payment of $106,407.86. Thereafter, the Government brought the instant case in the CIT, on November 28, 2006, demanding "unpaid duties along with fees and taxes in the amount of $106,407.86" also under claimed authority of 19 U.S.C. § 1553 and 19 C.F.R. § 18.8(c).

C.H. Robinson moved to dismiss the action asserting that the Government could demonstrate no set of facts that could make a *prima facie* case to hold the carrier liable for payment of duties, since C.H. Robinson had delivered the merchandise in accordance with the directions on the T&E Entries, and had copies of the CF 7512s, stamped by Customs in Laredo, and thus acceptable proof of delivery in accordance with the terms of the Entries and Customs' regulations. In denying the motion, on November 20, 2007, the CIT held that the stamped CF 7512s, while constituting proof of delivery under the regulations, *Slip Op.* at 7 (*JA* 7), did not preclude the Government from trying to show that there was "missing" merchandise, and that "[w]hether the Government can establish that Defendant's merchandise is indeed missing is a factual question for the merits." *See* Order, *United States v. C.H. Robinson*, No. 06-434, at 3 (Ct. Int'l Trade Nov. 20, 2007)

8

("Order 2007") (*JA 51*).   C.H. Robinson submits that this CIT determination correctly outlined the Government's burden of proof and persuasion.

Prior to trial, however, the CIT changed its stance, and announced a different, legally erroneous allocation of burdens.  In addressing C.H. Robinson's motion *in limine* to preclude the testimony of a Government "expert witness" who had not been timely identified or made available for deposition as required by CIT Rule 26,[5] the court sought to alleviate "some confusion regarding the burden of proof," which "stem[med] from the court's November 20, 2007 Order denying Defendant's motion to dismiss[.]" (*JA 53*).  The court explained—

> To further clarify and alleviate any potential confusion, the court notes that Plaintiff has the burden of persuasion (which remains fixed throughout trial) to establish by a preponderance that the subject merchandise is "missing" within the meaning of the regulation, or more simply, that the merchandise was not exported as required.

> \*          \*          \*

> Additionally, however, the court agrees with Plaintiff that Defendant has also misread the court's order by maintaining "that the Government must prove 'that the bonded merchandise was missing when the containers were presented to Customs at the port of destination.'"  Pl.'s Resp. 19 (quoting Def.'s Mot. *in Limine* 7).  To satisfy its burden of persuasion, Plaintiff simply needs to cast enough suspicion over the exportation/non-exportation of the merchandise for the fact-finder to conclude that the merchandise was not exported.

---

[5] The CIT subsequently entered a continuance so that C.H. Robinson could depose the witness.

*See* Order 2010, at 2-3 (some internal citations omitted) (*JA 54-55*).  This was a remarkable decision, which turned the burdens of proof and persuasion on their heads.  According to the CIT, the question was no longer whether merchandise was "missing" when C.H. Robinson effected "delivery" in accordance with the terms of the T&E Entries.  Moreover, rather than showing by a preponderance of the evidence that C.H. Robinson was "responsible for shortage, irregular delivery, or nondelivery at the port of destination or exportation" pursuant to 19 U.S.C. §18.8(a), the Government was required to merely "cast enough suspicion over the exportation/non-exportation of the merchandise for the fact-finder to conclude that the merchandise was not exported."  (Order 2010, at 3) (*JA 55*).  Merely "cast[ing] enough suspicion," the CIT said, would sustain the Government's burden of adducing a preponderance of evidence holding C.H. Robinson responsible for "missing merchandise," and would switch the burden of persuasion to the defendant.

The Court's reference to "suspicion over the exportation/non-exportation of merchandise" is even more remarkable because these terms nowhere appear in 19 C.F.R. § 18.8(c), the regulation which imposes on carriers the liability to pay duties.  The regulation indicates that the triggering events for such liability are "failure to make the required transportation, report, and delivery." *Id.*

10

The case was tried before Judge Leo M. Gordon on November 15, 2011. At trial, the sole evidence on which the Government relied to hold C.H. Robinson liable for payment of duties arising out of "failure to make the required transportation, report and delivery" were the falsified *Pedimentos* provided by TUG to C.H. Robinson as proof of export.[6] The Government presented nine witnesses in its case-in-chief, seven of whom were called to testify that the goods were not exported to Mexico. Each of the "non-exportation witnesses" testified under oath that he or she had no personal knowledge of whether the subject merchandise had in fact been exported to Mexico or diverted to the United States. *See* Tr. 52:13–53:8 (McCanlas cross) (*JA 77-78*); Tr. 107:10–108:2 (Lopez cross) (*JA 79-80*); Tr. 139:24–140:7 (Rodriguez cross) (*JA 85-86*); Tr. 311:3–16 (Santos Trevino cross) (*JA 95*); Tr. 361:24–362:5 (Fernandez Wilburn cross) (*JA 97-98*); Tr. 433:10–19 (Ingalls cross) (*JA 99*). Each witness testified that he or she had not examined the containers in which the subject merchandise was transported, and had no knowledge of whether any merchandise was missing from the containers when C.H. Robinson delivered them to the District Director of Customs at Laredo. *Id.* Indeed, none of these witnesses knew for a fact that any of the subject

---

[6] At trial, C.H. Robinson conceded the *Pedimentos* appeared to be false. (*Slip Op.* at 17) (*JA 17*).

merchandise had not in fact been delivered to the District Director and exported.[7]
*Id.* The Government relied entirely on the false *Pedimentos*; it never adduced an iota of direct evidence, testamentary or documentary, that the goods either had not been delivered in accordance with the terms of the T&E Entries, or had not been exported to Mexico.

The Court below entered judgment for the Government, and against C.H. Robinson. In its Opinion following trial, the court explained its allocation of the burden of proof as follows—

> The Government would have to rebut the presumption of proper delivery by proffering "as part of its case in chief evidence of the verification procedures undertaken pursuant to [the regulatory scheme] and their results that raised suspicions about the exportation of the merchandise, leading [the court] to conclude that [the merchandise] was not exported." [Order Denying Def.'s Mot. *in Limine* at 2]. Depending on the efficacy of the Government's opening case, C.H. Robinson, in turn, would have to come forward with its own evidence and explanations to account for the potentially missing subject merchandise. A bench trial followed to determine whether the

---

[7] The sole exception, remarkably, was Mr. Rodolfo Torres-Herrera, whom the Government had called as an expert witness. Although Mr. Torres-Herrera testified on cross-examination that he had not become involved with the case until 2009, many years after the shipments occurred (*see* Tr. 207:23–208:2) (*JA 88-89* ), and had never examined the merchandise (*see* Tr. 209:21–23) (*JA 90*), on cross-examination he repeatedly insisted that it is a "fact" that the goods never crossed into Mexico (*see* Tr. 210:6–8) (*JA 91*), despite admissions on cross examination showing Mexico's porous borders, the existence at the time of a 500% antidumping duty on Chinese-origin textile articles imported into Mexico, and Mr. Torres-Herrera's own testimony that, during the years in question, over 50% of all wearing apparel in Mexico had been imported from China illicitly, in order to avoid the antidumping duties. (*see* Tr. 219:2–221:5) (*JA 92-94*).

> Government could establish by a preponderance of the evidence that the subject merchandise was missing and therefore never exported.

(*Slip Op.* at 8) (*JA 8*) (bracketing in original).

At trial, the Government focused its case-in-chief on the sole allegation in its complaint, *i.e.*, that "C.H. Robinson has not provided adequate assurance that the three shipments of merchandise were properly exported and has refused to pay the duties, taxes, and fees owed as a result of the merchandise not being exported." (Compl. ¶ 31) (*JA 47*).[8] The Government proceeded on a theory that a violation of 19 U.S.C. § 1553 and 19 C.F.R. § 18.8(c) occurs when an in-bond shipment is not exported. To demonstrate a failure to export, the Government relied solely on a claim that the Mexican import *Pedimentos* were forged—although C.H. Robinson did not dispute this and the Government never suggested that C.H. Robinson had any responsibility for the *Pedimentos*. (*Slip Op.* at 17) (*JA 17*).

As noted above, on cross examination, C.H. Robinson demonstrated that none of the Government's witnesses had any personal knowledge as to the ultimate disposition of the goods. Further, no witnesses had any personal knowledge as to whether any merchandise was missing at any time before the goods were delivered to the District Director of Customs at Laredo, Texas. Most importantly, there was

---

[8] Of course, this misstates the regulation under which the Government claimed to be proceeding, which imposes on the carrier liability for duties for "failure to make the required transportation, report, and delivery." 19 C.F.R. § 18.8(c).

absolutely no presentation of direct or circumstantial evidence showing that there was missing merchandise when it was in C.H. Robinson's legal custody, at or before the time of delivery to the District Director of Customs at Laredo.

The lower court ultimately rejected C.H. Robinson's contention that liability under 19 U.S.C. § 1553 and 19 C.F.R. § 18.8(c) is limited to merchandise that goes missing while in the legal custody of the bonded carrier. The court found, as a matter of fact, that C.H. Robinson did not establish that the merchandise was exported or that it had transferred the merchandise to another carrier for exportation. (*Slip Op.* at 19) (*JA 19*). As a matter of law, the court found that—

> [A] bonded carrier's failure to account for the exportation of merchandise covered by a T&E entry is a legally sufficient basis for the imposition of duties under 19 C.F.R. § 18.8(c). *See* 19 C.F.R. §§ 18.7(c) and 18.8(c); Order Denying Mot. to Dismiss at 3. The Government may collect duties pursuant to 19 U.S.C. § 1592(d), or alternatively under 19 U.S.C. § 1553 and 19 C.F.R. § 18.8(c). Order Denying Mot. to Dismiss at 2-3.

(*Slip Op.* at 20–21) (*JA 20–21*). This means that the court interprets the bond as extending beyond delivery of the merchandise to the listed consignee. The court found that a CF 7512 showing receipt of the in-bond manifest is presumptive proof of proper delivery, yet held that "C.H. Robinson's obligations under 19 C.F.R. § 18.8(c) go beyond the certification of proper delivery . . . to include a responsibility to account for missing merchandise." (*Slip Op.* at 21) (*JA 21*). The court further held—

14

Had C.H. Robinson wanted to expose itself to liability for transporting the subject merchandise from one port to another, without needing to ensure the proper exportation of the merchandise, it could have done so by using an immediate transportation without appraisement entry. *See* 19 U.S.C. § 1552; 19 C.F.R. §§ 18.11-18.12. Before delivering the merchandise to another carrier for exportation, C.H. Robinson could then have ensured that the new carrier filed an Entry for Exportation, *see* 19 C.F.R. § 18.25, making the new carrier liable in the event that the new carrier failed to export the merchandise. Alternatively, C.H. Robinson could have had the merchandise entered into a warehouse for consumption. *See* 19 C.F.R. § 18.23(b). C.H. Robinson chose none of these options. Rather, by permitting itself to remain the carrier of the subject merchandise entered under a T&E entry, it would seem obvious that C.H. Robinson was responsible for ensuring the exportation of the subject merchandise. It is equally obvious that by failing to do so C.H. Robinson made itself liable for any violations that may have occurred relating to the exportation of that merchandise.[9]

(*Slip Op.* at 21–22) (*JA 21–22*). The court ultimately held that the Government established that it is "more probable than not that the subject merchandise was not exported," (*Slip Op.* at 22) (*JA 22*) and "that the Government is therefore entitled to a judgment for unpaid duties on the subject entries in the amount of $106.407.86, plus interest." (*Slip Op.* at 23) (*JA 23*).

This timely appeal followed.

## SUMMARY OF THE ARGUMENT

---

[9] It may be observed here that the CIT's holding is internally inconsistent. If, as the court found, C.H. Robinson was liable, under the T&E bond, for the movement of the goods after they were delivered to the Port Director of Customs at Laredo, then there would have been no basis or need for any other or further bond protection, such as an Immediate Exportation (IE) bond.

The CIT, in awarding judgment for the Government and against C.H. Robinson for duties in relation to the movement of in-bond goods, committed several reversible errors of law.

First, the court improperly expanded the reach of 19 C.F.R. § 18.8, which makes a bonded carrier liable for "shortage, irregular delivery, or nondelivery at the port of destination or exportation of bonded merchandise received by it for carriage." "Delivery" is a term of art which signifies a carrier's tender of in-bond goods to Customs at a designated point or place within the United States. In this case, C.H. Robinson delivered the subject bonded goods to the District Director of Customs at Laredo, Texas—the designated consignee under the terms of the T&E Entries. Furthermore, C.H. Robinson obtained from the District Director of Customs receipt-stamped copies of the CF 7512 in-bond entries, which copies constitute "acceptable proof of proper delivery of bonded merchandise to Customs at the port of destination or exportation," pursuant to 19 C.F.R. § 18.8(a).

However, the CIT held that C.H. Robinson's obligations under the T&E Entries required it to ensure the exportation of the bonded merchandise to a foreign country, in this case Mexico. This improperly expanded C.H. Robinson's obligations beyond making proper "delivery" of bonded cargo to the District Director at the port of exportation. This was inconsistent with 19 C.F.R. § 18.8(c), which allows Customs to demand payments of duties and costs from the bonded

16

carrier in the event of "the failure to make the required transportation, report, and delivery." It was undisputed that C.H. Robinson made the required transportation, from Los Angeles to Laredo, and that it made the required reports. The receipt-stamped copy of the CF 7512s constituted evidence of "delivery."

Second, the CIT also erred, as a matter of law, in holding that the Government was not required to demonstrate "shortage, irregular delivery or nondelivery . . . at the port of exportation," but that it could merely "cast suspicion" on whether the goods were exported to Mexico, after the movement under the T&E Entries had concluded. (*See* Order 2010, at 3) (*JA 55*). This construction erroneously expanded C.H. Robinson's liability beyond that specified in the governing regulations, and made the company potentially liable for losses which might have occurred after the goods left its possession. The elements of a violation of 19 C.F.R. § 18.8 involving a T&E Entry require the triggering act of shortage, irregular delivery or misdelivery to occur before or upon delivery at the "port of exportation," and not at some subsequent time or in some different place.

Third, the CIT erred, as a matter of law, by holding that it was sufficient for the Government to "cast enough suspicion over the exportation/non-exportation of the merchandise for the fact-finder to conclude that the merchandise was not exported," and that merely casting "suspicion" was sufficient to carry the Government's burden of proving the claimed violation by a preponderance of the

evidence, and to switch to C.H. Robinson the burden of persuasion to show that no violation occurred. "Suspicion" is not evidence and, without more, cannot carry the Government's burden of proof. Moreover, suspicion of "exportation/nonexportation" is insufficient to establish any element of the Government's case, which requires it to show shortage, irregular delivery or misdelivery at the port of exportation.

The CIT's conflation of "delivery" and "exportation" is a fundamental legal error, and mandates reversal of the decision below. It is quite possible for proper "delivery" of a bonded cargo to occur, even before "exportation" occurs, and even if it never occurs. Similarly, the fact of exportation does not mean that there was proper "delivery" under the terms of a T&E Entry. Had C.H. Robinson driven the in-bond cargoes directly to Mexico and established their exportation beyond any doubt, it would still have been liable for misdelivery or non-delivery if it did not present the cargoes to Customs at the port of exportation.

Finally, the Government has chosen to pursue a narrowly-tailored cause of action—collection of import duties from a bonded carrier—whose elements are clearly spelled out in 19 C.F.R. § 18.8. The evidence presented by the Government below, wholly circumstantial, was insufficient as a matter of law to establish any single element of that cause of action.

18

Even viewed in the light most favorable to the Government, the circumstantial evidence (falsified Mexican import *Pedimentos*) was not sufficient, by reason of common experience, to establish, by a preponderance of the evidence, the existence of any element of the claimed misdelivery/nondelivery violation.

## ARGUMENT

**The Court of International Trade's Decision that C.H. Robinson Violated 19 U.S.C. § 1553 and 19 C.F.R. § 18.8 Must Be Reversed Because the Court Articulated and Followed an Incorrect Legal Standard.**

### I.    Standard of Review

On appeal from the CIT following a bench trial, this Court reviews the lower court's legal determinations without deference. *United States v. Ford Motor Co.*, 463 F.3d 1286, 1290 (Fed. Cir. 2006); *United States v. Hitachi Am., Ltd.*, 172 F.3d 1319, 1326 (Fed. Cir. 1999). Findings of fact are reviewed for clear error. *Hitachi Am.* at 1327.

### II.    The Court Unlawfully Expanded C.H. Robinson's Legal Obligations Beyond Those Specified in the Relevant Laws and Regulations.

The CIT's decision unlawfully expanded C.H. Robinson's obligations under applicable regulations, transforming a requirement to make delivery "at the port of destination or exportation of bonded merchandise received by it for carriage," 19 C.F.R. § 18.8(a), into an obligation to "export," or guaranty of the export of such goods.

19

Initially, it should be noted that § 18.8, the regulation alleged to have been violated, is one dealing with the "delivery" of goods.  Carriers are liable for "shortage, irregular delivery, or nondelivery" of merchandise "at the port of destination or exportation." *Id.* § 18.8(a).  It may be observed that the "port of exportation" referred to in the regulation is a location in the United States, and not a foreign location.  Liquidated damages may be assessed against the carrier for "shortage, failure to deliver, or irregular delivery." *Id.* § 18.8(b). The obligation of a carrier to pay duties under the regulation attaches upon "the failure to make the required transportation, report, and delivery." *Id.* § 18.8(c).  Indeed, nowhere in the regulation is there any reference to the term "export" or "exportation." "Exportation" has traditionally signified the sending of goods outside the United States with the intention of joining them with the goods of a foreign country, a concept that signifies crossing the territorial border.  *See Fla. Sugar Mktg. and Terminal Ass'n, Inc. v. United States*, 220 F.3d 1331, 1335 (Fed. Cir. 2000).

No evidence was adduced at trial indicating any "shortage" of goods carried by C.H. Robinson to the port of exportation under the subject T&E Entries.  There were no allegations of any failure to "report," or to "deliver" the merchandise to the District Director.  The stamped CF 7512s constitute "adequate proof" of delivery under the subject regulation, 19 C.F.R. § 18.8.  In the face of these facts,

however, the lower court expanded the scope of the carrier's obligations under the regulation.

The regulations are particularly important in this case, since they were issued under an express Congressional directive contained in 19 U.S.C. § 1553, which provides for the transportation in-bond, prior to exportation, "under such regulations as the Secretary of the Treasury shall prescribe." Regulations such as 19 C.F.R. § 18.8, promulgated in accordance with the requirements of the Administrative Procedure Act, 5 U.S.C. § 706, have the force and effect of law, and are binding both on the public and the government. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 313 (1979); *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001) (citing *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843–844 (1984)).  In this case, the lower court expanded the carrier's obligations under the regulation beyond the stated bound of "delivery" to the "port of exportation," and made the carrier liable for duties based on events which apparently occurred after C.H. Robinson had delivered the goods to the only consignee identified in the T&E Entries, namely, the "District Director of Customs, Laredo TX (2304)." (*JA 40-42*).  No legal basis was ever identified by the Government or the lower court for expanding the carrier's obligations beyond the point where delivery has been made in accordance with the specific terms of

the T&E Entries.  Nor was any non-regulatory basis for the assessment of duties against the carrier identified or argued.

In its 2007 ruling denying the carrier's motion to dismiss, the CIT properly stated the legal standard.  (*JA 49-52*).  C.H. Robinson had acceptable proof of "delivery" under the regulation in the form of the receipt-stamped CF 7512s, and the burden fell to the Government, by a preponderance of the evidence, to show that there was "missing" merchandise at the time of delivery for which the carrier was responsible.[10]  In a 2010 Order on a motion *in limine* (*JA 53-57*), and in its *Opinion* (*JA 1-24*), however, the CIT changed position, holding that "[a]s the bonded carrier responsible for the subject entries, C.H. Robinson has a duty to ensure that the subject merchandise was timely exported out of the United States or lawfully entered into U.S. commerce or warehouse." (*Slip Op.* at 21) (*JA 21*).  The CIT further erred by relieving the Government of the burden to establish that there was "missing" merchandise by a preponderance of the evidence to one of simply casting "suspicion" on whether exportation occurred.  "To satisfy its burden of persuasion, Plaintiff simply needs to cast enough suspicion over the exportation/non-exportation of the merchandise for the fact-finder to conclude that the merchandise was not exported." (Order 2010, at 3)  (*JA 55*).

---

[10] Had the Court articulated in 2007 the standard which it subsequently announced in 2010 and applied at trial, C.H. Robinson might have appealed from the denial of its dismissal motion. However, the CIT revised its finding on the standard long after the time for an appeal of the 2007 Order had expired.

This "missing merchandise" standard required the Government to show, as a matter of fact, that the subject merchandise went missing before delivery was made to the District Director of Customs in Laredo, Texas, *i.e.*, when the goods were still in the legal custody and control of C.H. Robinson. This required a temporal and geographic showing of when and where the merchandise went missing. The involved conduct, viewed in light of all of the evidence, including the stamped 7512s, must have indicated by a preponderance of the evidence that C.H. Robinson controlled the merchandise when it went missing and thus was guilty of "shortage, irregular delivery or nondelivery" to the "port of exportation" for which it could be held liable. *See* 19 C.F.R. § 18.8(a). The Government made no attempt to prove "missing merchandise" at trial, but instead predicated its case solely on circumstantial evidence of non-exportation (the false *Pedimentos*) to support its theory of the case.[11]

The CIT held that because C.H. Robinson was unable to demonstrate exportation, (*Slip Op.* at 19) (*JA 19*), "the Government has established that the

---

[11] To be sure, there was evidence adduced at trial suggesting that the false *Pedimentos* might have in fact been used to smuggle the goods into Mexico. This evidence included the existence of the 500% antidumping duties on Chinese textiles imported into Mexico, the testimony of the Government's expert witness that (i) falsification of *Pedimentos* was widespread; and (ii) that at the time in question, perhaps half of all apparel imported into Mexico was imported clandestinely to circumvent the antidumping duties. *See* Tr. 219:2–221:5 (Torres-Herrera Cross) (*JA 92*). The CIT elected to weigh the evidence differently, however, and we do not ask this Court to re-weigh that evidence.

subject merchandise is missing[.]" (*Slip Op.* at 22) (*JA 22*).  As explained below, this view of circumstantial evidence is unsupportable.  However, it demonstrates that the court conflated C.H. Robinson's duty to "deliver" merchandise to the District Director, as required by the T&E Entries, with a broader duty to "export" the merchandise—a requirement not mentioned in the governing regulation.  The CIT relied on two misconceptions regarding C.H. Robinson's obligations respecting the subject merchandise: (i) the notion that the carrier of goods moving under cover of a bonded T&E entry to the port of exportation is in all cases the party responsible for the exportation of the goods, *i.e.*, carrying the goods across the territorial border; and (ii) that irregular delivery or nondelivery under 19 C.F.R § 18.8 includes, or can include, events transpiring subsequent to delivery to the District Director of Customs at the port of exportation.

### A.    Neither the Statute nor Regulations Requires Exportation Under the T&E Entry.

There is nothing in the statute, 19 U.S.C. § 1553, or regulation, 19 C.F.R. § 18.8, that explicitly or implicitly obligates the T&E bonded carrier to ensure the exportation of the goods that it carried to the port of exportation (a domestic location) to a foreign location.  Nor was there anything in the directives, policies or procedures at the Port of Laredo, Texas, in effect at times relevant to this case, that

24

obligated the T&E bonded carrier to ensure exportation.[12]    When C.H. Robinson made delivery of the subject containers to the Port of Laredo and obtained proof of delivery in the form of the stamped CF 7512s, its liability with respect to that merchandise under the T&E Entries was fully discharged.

Indeed, once delivery was made, the subject merchandise was, as a matter of law, under the legal possession and control of the District Director of Customs at Laredo, and the carrier had "acceptable proof of proper delivery" as set out in 19 C.F.R. § 18.8(a).  This evidence of proper delivery might have been rebutted had Customs broken the seals on the containers, inspected their contents, and concluded that some or all of the merchandise described in the T&E Entries was missing.  It did not.[13]    In the face of "acceptable evidence" of proper delivery, Customs must perforce bear a burden of overcoming that "acceptable evidence" in

---

[12]    Obviously, nothing in an informal port directive, policy or procedure which could countermand, or expand, the requirements set out in a regulation having the force and effect of law.

[13]    It bears noting that the Customs Regulations contemplate that merchandise transported under bond will be in containers bearing a seal, either a Customs-applied seal, or a commercial seal meeting Customs requirements, whose details are communicated to Customs. 19 C.F.R. § 18.4. Invoices admitted into evidence at trial indicate that the three containers holding the subject merchandise had numbered seals. (*See* Mario's Transports Inc. Freight Bills to C.H. Robinson, *JA 73-75*). Where, as here, goods are transported in sealed containers, the receipt-stamped CF 7512 is the carrier's principal evidence of proper delivery without shortage, as the carrier is not allowed to break the seals in normal circumstances, and so has no physical evidence of the content of the container, only documentary evidence.

order to assess duties under § 18.8. None of the Government's evidence at trial, circumstantial though it was, spoke to "delivery," or the place, manner and time of delivery; it purported to speak to "exportation" (or, more appropriately, the question of whether the goods had been properly *imported* into Mexico)—facts occurring after the delivery of the goods covered by the T&E Entries.

C.H. Robinson followed precisely and completely the specific procedures established by Customs for the carriage of goods to Laredo, Texas under T&E entries. Indeed, had the carrier proceeded directly to Mexico, without presenting the goods to the Port Director at the port of exportation, it would have been guilty of irregular delivery, or nondelivery, even if it could have presented incontestable evidence of proper importation into Mexico (*e.g.*, *Pedimentos* certified as accurate by Mexican customs authorities). Bonded goods destined for exportation must be delivered to the port of exportation for processing in accordance with that port's policies and procedures. Bonded shipments for exportation cannot make a border crossing into Mexico and must necessarily be consigned to Customs before being transferred to the exporting carrier.

Uncontested evidence at trial indicated that, at relevant times, United States carriers such as C.H. Robinson were prohibited from carrying goods into Mexico. *See* Tr. 486:10–487:4 (Munoz cross) (*JA 101-102*). Indeed, the T&E Entries indicated that, following delivery to Customs, the merchandise was to be directed

26

to a Mexican forwarder, on the United States side of the border, and said forwarder would arrange the movement of the goods into Mexico. (*JA 40-42*). Thus, contrary to the CIT's findings, C.H. Robinson could not have guaranteed the "exportation" of the goods to Mexico, nor could it have deposited them in a bonded warehouse, as it was not the owner or purchaser of the merchandise. (*Slip Op.* at 21) (*JA 21*).

Similarly, the CIT's suggestion that C.H. Robinson could or should have availed itself of some post-delivery procedure, such as the use of an Immediate Transportation Without Appraisement (IT) entry, followed by the use of an IE bond misses the mark. (*Slip Op.* at 21–22) (*JA 21–22*). The testimony of the Government's witnesses in this regard is similarly misguided. *See* Tr. 28:24–29:15 (McCanlas direct). Delivery obligations under an IT entry are identical to those under a T&E entry, save that Laredo would be considered the "port of destination" rather than the "port of exportation." Moreover, once C.H. Robinson delivered the cargo to the District Director at Laredo, it lost control over the cargo; and it was solely for the District Director to determine the procedures for on-carriage, who would perform such procedures, and the terms and conditions (including an IE entry) under which such on-carriage would be performed.[14]

---

[14] The lower court's holding in this regard is internally inconsistent. If, as the CIT suggested, a T&E entry carries with it post-delivery obligations to guaranty

27

Because the *Opinion* unlawfully expanded the "delivery" obligations imposed by 19 C.F.R. § 18.8 into post-delivery obligations to guaranty exportation to a foreign country, its judgment was erroneous as a matter of law, and must be reversed.

**B.    Events Occurring After Proper Delivery Cannot Be Attributable to the Bonded Carrier.**

The circumstantial evidence on which the Government relied at trial—false Mexican import *Pedimentos*—clearly purports to relate to events occurring (or not occurring) after the subject merchandise was "delivered" to Customs at the port of exportation.    Events subsequent to delivery are outside the scope of C.H. Robinson's Customs Bond, its obligations under the T&E Entries, and the terms of the governing regulations.    C.H. Robinson's obligations relative to the T&E Entries terminated at the time it properly delivered the subject merchandise to the District Director at Laredo and obtained stamped receipt copies of the CF 7512s which constitute evidence of delivery.    19 C.F.R. § 18.8(a).    Because the Government made no claim in its Complaint, and made no showing at trial, that the delivery of in-bond merchandise to the Port Director was irregular, no liability under 19 U.S.C. § 1553 or 19 C.F.R. § 18.8 can attach to C.H. Robinson.

---

the crossing of the political border, no purpose would or could be served by having a new IE entry issued.

Indeed the lower court did not doubt the legitimacy or authenticity of the CF 7512s or their stamps (*Slip Op.* at 21) (*JA 21*), but the court suggested that the procedures Customs had in place at the Port of Laredo at the relevant times were insufficient to confirm delivery.  (*Slip Op.* at 9) (*JA 9*).  Customs, however, is bound by a presumption of regularity which presumes that "public officers perform their duties correctly, fairly, in good faith, and in accordance with the law and governing regulations."  *Alaska Airlines, Inc. v. Johnson*, 8 F.3d 791, 795 (Fed. Cir. 1993) (quoting *Parsons v. United States*, 670 F.2d 164, 166 (Ct. Cl. 1982)) The presumption assumes that Customs performs its duties in a manner which properly controls the borders.  *See Jazz Photo Corp. v. United States*, 439 F.3d 1344 (Fed. Cir. 2006) (Customs is presumed to have enforced the laws relating to inspection and admission of goods in a way to allow companies to assume that goods present in the United States were lawfully here).

This presumption is directly relevant to the lower court's reference to the "unmonitored stamp machine in the lobby of CBP's export lot at the Port of Laredo," (*Slip Op.* at 9) (*JA 9*), which implies (without holding) that the stamped 7512s are unpersuasive as evidence of delivery.[15]  C.H. Robinson's carrier was instructed to bring the cargoes in question to the District Director of Customs at a

---

[15] Weight accorded by the lower court to the stamped CF 7512s would appear to be irrelevant, inasmuch as 19 C.F.R. § 18.8(a) deems them "acceptable evidence of proper delivery."

facility designated by Customs at the Port of Laredo, Texas. Once the goods were delivered to the District Director, they were purely and solely in Customs' possession and control. It was up to the District Director to conduct inspection. The shipper consented to inspection, though no such inspection was performed. The CF 7512s were stamped using the official stamp provided by Customs, in the manner prescribed by Customs. This is presumably the regular procedure for documenting delivery of goods; and certainly Customs made no attempt at trial to adduce any evidence to the contrary.

Customs had complete discretion to determine the procedures for documenting the delivery of T&E entries. C.H. Robinson is certainly entitled to rely upon the presumption of regularity attaching to Customs officers' actions, and to conclude, and to assert, that the stamped CF 7512s which were placed on the record at trial are "acceptable proof of proper delivery" as defined in 19 C.F.R. § 18.8(a).

It may be that Customs' practices at the Port of Laredo for handling in-bond movements of cargo were deficient. The export inspection yard was located some distance from the border; and Customs released goods following delivery without requiring the carriers to move the goods under IE entries. The GAO has

recognized deficiencies in the Customs in-bond procedures.[16]  In fact, subsequent to the events involved in this case, Customs amended its procedures for handling in-bond deliveries at Laredo.[17]  Nonetheless, the bonded carrier cannot be blamed for insufficiencies in Customs' stated regulations and policies.[18]  The presumption of regularity, combined with the regulatory presumption of delivery, 19 C.F.R. § 18.8(a), extinguished C.H. Robinson's liability for irregular delivery under the applicable statute and regulations under the facts of this case.

### C.  Delivery of Goods to the District Director Constituted Satisfaction of C.H. Robinson's Obligations Under Its Carrier Bond and the T&E Entries in This Case

C.H. Robinson's documented delivery of the subject merchandise to the District Director fulfilled its delivery requirements under 19 C.F.R. § 18.8.  C.H.

---

[16] *See, e.g.*, GAO Report 04-345 to Congressional Committees, *International Trade—U.S. Customs and Border Protection Faces Challenges in Addressing Illegal Textile Transshipment* (Jan. 2004).

[17] Indeed, Customs has since recognized that its regular procedures at the Port of Laredo were insufficient in 2002 and relied only on the "honor system" and did not provide the agency with sufficient control. *See* Tr. 127:14–130:23 (Rodriguez direct) (*JA 81*). Subsequent to the events at bar, Customs changed its procedures to require supervised export of the T&E entries only at the physical border crossings. *See* Tr. 128:2–4 (*id.*) (*JA 82*). This fact does not change, but underscores, the fact that the goods were likely diverted after C.H. Robinson's proper delivery.

[18] The Customs Regulations envision "only such supervision of the lading for exportation of merchandise covered by entry or withdrawal for exportation or for transportation and exportation as is reasonably necessary to satisfy him that the merchandise has been laden on the exporting conveyance." 19 C.F.R. § 18.7(b). If Customs' supervisory procedures were insufficient or ill-advised, any failure to export likely resulted from a diversion that occurred after delivery was made by C.H. Robinson.

Robinson had no obligation under its bond for the disposition of the subject merchandise outside of the terms and conditions of the T&E Entries. Allegations of misdelivery against a bonded carrier can only pertain to those events contributing to "any shortage, failure to deliver, or irregular delivery, as provided in such bond." 19 C.F.R. § 18.8(b). The Complaint makes no claim, and at trial there was no showing, that C.H. Robinson failed to deliver the subject merchandise to the listed consignee or that there was any shortage upon delivery.

Indeed, upon the carrier's filing of a complete set of CF 7512s with Customs upon arrival at the Port of Laredo, Texas, the goods fell under the complete and absolute control and dominion of the local District Director of Customs. In *Indemnity Insurance Co. of North America v. Hanjin Shipping Co.*, 348 F.3d 628 (7th Cir. 2003), a customs-bonded carrier, Hanjin, contracted to ship tools from China to an Indiana distribution facility owned by Lowe's, the hardware retailer. Hanjin, in its capacity as customs-bonded carrier, delivered the goods to a Customs office located in the Port of Chicago, Illinois. Customs there directed that the goods be detained for examination by the CES operator, O'Hare Services, and its subcontractor, Channel Distribution. Subsequently, the container of goods was stolen from Channel's container yard. Lowes' insurance carrier paid the claim, and then commenced suit against Hanjin, seeking to hold that carrier liable for the

loss. The Seventh Circuit, reversing a decision below, held that placing the goods

into the custody of Customs terminated the contractual liability of the carrier—

> Hanjin's duty under the waybill was to deliver the container either to
> Lowe's at the North Vernon, Indiana, warehouse, or to follow any
> superseding written instructions for delivery that it received from
> Lowe's customs broker, Fritz. See *Servicios-Expoarma, C.A. v. Indus.
> Maritime Carriers, Inc.,* 135 F.3d 984, 992 (5th Cir. 1998)
> ("'Delivery' [under COGSA] occurs when the carrier places the cargo
> into the custody of whomever is legally entitled to receive it from the
> carrier."). Unless it breached that duty, it cannot be liable under the
> contract. Once Fritz issued the written instructions to Hanjin telling it
> to deliver the container to Land Container, Hanjin was both entitled to
> and required to turn the container over to the specified trucking
> company. Indeed, the Customs Service had the authority to require
> this inspection, see 19 U.S.C. § 1581 (authorizing customs officers to
> examine all cargos entering the United States and to use all necessary
> force to compel compliance), and Hanjin had a duty to cooperate. See
> 19 U.S.C. § 1433 (vessels or vehicles arriving in U.S. ports or at the
> border must report arrival to customs facilities and person); *id.* § 1436
> (unlawful to fail to comply with § 1433). It was entirely predictable to
> the parties that the U.S. Customs Service might choose to inspect the
> contents of the container and thereby require a temporary diversion of
> the container from the planned itinerary. Hanjin had no reason to think
> that the instructions it received from Fritz were suspicious or
> unreasonable.

*Id.* at 636. Concluding that the cargo was no longer under the carrier's control at

the time of theft, but was rather in the control of Customs or its designated

contractor, the Seventh Circuit concluded that Hanjin, the bonded carrier, was not

responsible for loss.[19]

-----

[19] Although *Indemnity Insurance Co.* dealt with a carrier's liability for
misdelivery or irregular delivery under the terms of its contract of carriage, it sheds
light on what constitutes a proper "delivery" of goods moving under Customs in-

Even if, *arguendo*, the T&E Entries are construed as requiring presentation at the border, it is clear that the Customs office where the stamp was obtained constitutes the border, or an area equivalent to the border in the instant case. *See, e.g.*, *United States v. Strmel*, 574 F. Supp. 793 (E.D. La. 1983) (holding that the "border" need not be the actual geographic point where the two countries' territories meet, but can be a place chosen for the convenience of Customs' officials); *see also United States v. Dreyfus-de Campos*, 698 F.2d 227, 229 (5th Cir. 1983) (setting out a tripartite test to determine if an area is the "functional equivalent" of the border for search and seizure cases under the Fourth Amendment.); *United States v. Garcia*, 673 F.2d 1349, 1362–63 (11th Cir. 1982); *United States v. Reyna*, 572 F.2d 515 (5th Cir. 1978). Similarly, the office to which the instant cargoes were taken constituted the functional equivalent of the border, the point at which Customs was, if it wished, to inspect the cargo.[20] The bonded carrier did not have the authority or power to bring the goods to any other

---

bond procedures. In that case, the bonded carrier surrendered cargoes to the CES in accordance with legal and regulatory requirements. The court noted that this constituted regular delivery of the cargo, and that the carrier could not be liable in contract law for irregular delivery.

[20] The bond obligated delivery to the District Director before exportation so the transfer of goods from the bonded carrier to the exporting carrier would occur in an area that is the functional equivalent of the border, in a reduced constitutional zone, permitting Customs to conduct efficient searches and seizures. If C.H. Robinson had an obligation to "export" the goods, as the Court held (*Slip Op.* at 5) (*JA 5*), it was not permitted to cross the territorial border; and thus, no bonded carrier could ever meet the obligations imposed by the court, *i.e.*, to ensure exportation.

place.  The delivery of the goods to the District Director constituted the delivery of the goods to the consignee noted on the T&E Entries, in strict compliance with the procedures which Customs itself had established.

The CIT's decision unlawfully holds C.H. Robinson responsible for acts which go beyond the scope of the T&E Entries as well as the carrier's obligations under 19 C.F.R. § 18.8.  The Complaint requests relief pursuant to 19 C.F.R. § 18.8(b) and (c) (Compl. ¶¶ 29–30) (*JA 46*); however, the Government does not state any facts, and it made no showing at trial, that would indicate liability under either 19 C.F.R. § 18.8(b) or (c) because: (i) there is no claim that there was any shortage, failure to deliver, or irregular delivery; and (ii) there was no failure to make the required transportation, report, and delivery.  A failure to export does not equate to the T&E bonded carrier's failure to deliver.

Because C.H. Robinson's duty under the T&E bond terminated with the confirmed delivery of the subject merchandise at the Port of Laredo, Texas, any event that may have occurred subsequent is not actionable against the bonded carrier.  Assuming that the *Pedimentos* submitted were not valid, that fact (which may suggest the goods were not exported) does not give rise to a claim against the bonded carrier whose obligations under its bond were extinguished.

No facts alleged in the Complaint relate to any of the violations listed in 19 C.F.R. § 18.8(b) or (c).  Specifically, the provisions of 19 U.S.C. § 18.8(c) provide

for imposing duty liability on a carrier only where there has been a "failure to make the required *transportation, report and delivery*" (emphasis added).  The applicable regulations are bereft of any reference regarding a failure to "export." Accordingly, the court erred as a matter of law in holding C.H. Robinson liable under 19 U.S.C. § 1553 and 19 C.F.R. § 18.8 for "not export[ing] or otherwise account[ing] for the subject merchandise[.]"  (*Slip Op.* at 23) (*JA 23*).

III.  **The Lower Court Erred in Holding that Mere "Suspicion" of Non-Exportation Shifted the Burden of Persuasion to the Defendant.**

In addition to improperly expanding C.H. Robinson's liability beyond the "delivery" of merchandise transported under cover of T&E entries, the CIT also erred by holding that mere "suspicion" arising from ambiguous circumstantial evidence was sufficient to carry the Government's burden of proving shortage, irregular delivery, or nondelivery by a preponderance of the evidence, and to shift the burden of persuasion to C.H. Robinson.

As noted above, the Government at trial did not introduce any direct evidence that C.H. Robinson failed to deliver the subject merchandise to Customs at Laredo in accordance with the terms of the T&E Entries.  Its witnesses freely admitted that they had not inspected the cargo before, at the time of, or after delivery.  *See* Tr. 52:13–53:8 (McCanlas cross) (*JA 77-78*); Tr. 107:10–108:2

(Lopez cross) (*JA 79-80*); Tr. 139:24–140:7 (Rodriguez cross) (*JA 85-86*); Tr. 311:3–16 (Santos Trevino cross) (*JA 95*); Tr. 361:24–362:5 (Fernandez Wilburn cross) (*JA 97-98*); Tr. 433:10–19 (Ingalls cross) (*JA 99*). None of them knew for a fact that any merchandise was "missing." None knew whether or not the subject merchandise had been exported to Mexico or not.

The only evidence on which the Government relied for the proposition that the subject merchandise was neither "delivered," nor "exported," was the false *Pedimentos*.[21] This evidence was admittedly circumstantial, and was ambiguous. While circumstantial evidence might be sufficient, in a given case, to establish the Government's case by a preponderance of the evidence, and shift the burden of persuasion to the defendant, this is not what happened here. Rather, the CIT held that if the *Pedimentos* "cast suspicion on" the exportation/nonexportation of the merchandise, this shifted the burden of persuasion. This is simply incorrect, as a matter of law.

It is true that a party may prove a claim or defense solely on the basis of circumstantial evidence. *See, e.g.*, *Jazz Photo Corp.*, *supra*, 439 F.3d 1344. However, the circumstantial evidence must be sufficient to carry a plaintiff's burden to prove facts by a preponderance of the evidence, *i.e.*, to show that a state

---

[21] If, as the Government contends, the subject merchandise was diverted into the United States under circumstances making the assessment of duties appropriate, one would reasonably question why the perpetrators would bother to forge Mexican customs documents, thereby breaking the laws of a second country.

of facts is more likely true than not. Circumstantial evidence which merely raises a suspicion or speculation is insufficient to prove a case, or shift the burden of persuasion.

Circumstantial evidence relates to a series of facts other than the particular fact sought to be proved. The party proffering circumstantial evidence argues that this series of facts, by reason of experience, is so closely related to the facts to be proved that the fact to be proved may be inferred simply from the existence of the circumstantial evidence. A fact-finder's preference for circumstantial evidence over direct evidence is not unreasonable *per se*. *See, e.g.*, *Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1374 (Fed. Cir. 2005). However, in order to sustain a party's burden of proof, circumstantial evidence must constitute more than mere suspicion. "Vital facts, however, may not be established by piling inference on inference. Some suspicion linked to other suspicion produces only more suspicion, which is not the same as some evidence." *Davis-Lynch v. Moreno*, 667 F.3d 539 (5th Cir. 2012). Circumstantial evidence and inferences drawn therefrom must tend to establish the specific facts necessary to sustain a claim or accusation. Mere suspicion or speculation, however, is insufficient. *United States v. Delgado*, 672 F.3d 320 (5th Cir. 2012) (citing *United States v. Kurt*, 986 F.3d 309, 312 (9th Cir. 1993)).

While circumstantial evidence may be used to prove any fact, "mere suspicion or speculation is insufficient to establish an essential element." *United States v. Dinkane*, 17 F.3d 1192, 1196 (9th Cir. 1994). "Mere suspicion or speculation may not be the basis for the creation of logical inferences." *United States v. Bennett*, 621 F.3d 1131 (9th Cir. 2010); *see also United States v. Lindsay*, 634 F.3d 541 (9th Cir. 2011).

In this case, the Government relied solely on false *Pedimentos*. These Mexican import documents are typically generated after goods have left the United States, and when they are being presented to Mexican customs authorities for entry into Mexico. Normally, the existence of a *Pedimento* would tend to prove exportation, and Customs routinely accepts *Pedimentos* as proof of exportation in a variety of circumstances, such as duty drawback. *See, e.g.*, *Customs Headquarters Ruling 562093* (Jun. 22, 2001) (*Pedimento* sufficient to prove exportation of United States-origin components to Mexico); *Customs Headquarters Ruling H082576* (Jan. 18, 2012) (abstracts of *Pedimento* information deemed sufficient evidence of export to Mexico for duty drawback purposes). In this case, however, Customs asked the Court to draw the opposite inference from the existence of a *Pedimento*—namely, that the goods were *not* exported to Mexico.

But that is not all, however. The Government asked the lower court to draw further inferences from the existence of these documents: (1) that the goods were

diverted into the United States; (2) that the diversion occurred while the goods were in possession of C.H. Robinson; (3) that the diversion occurred prior to the time C.H. Robinson made "delivery" of the goods to Customs under the terms of the T&E Entries; and (4) that the misdelivery was total, meaning that all the subject merchandise went "missing" prior to delivery.  The lower court appears to have drawn all of these inferences.  This is precisely the practice of "piling inference on inference" which the court cautioned against in *Davis-Lynch*, *supra*, the practice of linking one suspicion to another, which yields "only more suspicion, which is not the same as some evidence."  This was patent error by the court below.  The court is required to "decide the case fairly on the law and not on mere conjecture, ambiguous circumstantial evidence and suspicion."  *Jacob Blinder & Sons v. Gerber Products Co*., 166 F.3d 112, 138 (3d Cir. 1999).

Moreover, the lower court held that because the circumstantial evidence— *i.e.*, the *Pedimentos*—raised a "suspicion" of non-exportation, this shifted the burden of persuasion to Defendant.  But circumstantial evidence is insufficient where it raises a mere suspicion that a defendant might be responsible for placing products in a given location.  It does not rise to a preponderance of evidence that any defendant placed any goods in an incorrect location. *See, e.g.*, *Crofton Ventures L.P. v. G&H P'ship*, 258 F.3d 292 (4th Cir. 2001).

40

By the time *Pedimentos* would have been created, the subject merchandise would have had passed through several hands: TUG, the shipper; C.H. Robinson; Customs; Mario Pena, Inc., the forwarder who received the containers after the District Director of Customs at Laredo released them; the carrier who would have transported goods onward from Mario Pena's facility; and possibly Mexican customs brokers and forwarders. For the lower court to determine, based solely on that evidence, that the Government had carried its burden of proof and shifted the burden of persuasion to C.H. Robinson, presumes far too much.

Not only did the lower court err by improperly expanding C.H. Robinson's bonded carrier obligations beyond those imposed by governing law and regulations, it erred by holding that the burden of persuasion shifted based merely on "suspicion" arising from ambiguous circumstantial evidence.

## IV.  The Remedy That the Government Sought Required a Highly Specific Factual and Legal Showing.

Plaintiff brought this claim for payment of duties under authority of 19 U.S.C. § 1553 and 19 C.F.R. § 18.8.  These authorities require highly specific showings.  They apply only in the case of a bonded carrier's "failure to make the required transportation, report, and delivery," 19 C.F.R. § 18.8(c).[22]  They do not punish generalized misconduct in the entry or exportation of merchandise.

_____

[22] By its terms, the regulation would appear to require a failure of all three obligations: transportation, report and delivery. For purposes of this appeal,

41

If Customs wished to recover "withheld duties" arising from more generalized conduct, its remedy would likely be under 19 U.S.C. § 1592, which provides for the recovery of penalties and duties from persons who enter, or attempt to enter, merchandise by means of false and material statements, acts, or practices, or by means of material omissions.  Although Customs commenced administrative proceedings to collect the duties from C.H. Robinson under § 1592, it abandoned those efforts, and allowed the statute of limitations for bringing such an action to lapse, presumably because the Government concluded that it could not prove that C.H. Robinson had violated the statute.

"Pursuant to its Article I power under the United States Constitution, Congress has throughout the years established an elaborate scheme to regulate the importation of goods entering into the stream of commerce of the United States." *Forest Prods. Nw. Inc. v. United States*, 62 Fed. Cl. 109, 115 (2004).  This well-developed statutory scheme includes procedures for the assessment, collection, and liquidation of both regular and antidumping duties.  *Id.* at 116.  If in fact there were a loss of revenue to the Government, arising out of a "material omission," for example, the failure to file a consumption entry for goods, the Government might proceed against claimed violators under § 1592.

---

however, C.H. Robinson assumes that a failure of any single obligation specified in the regulation would suffice to trigger liability.

The Government eschewed this possible cause of action in favor of the more limited cause of action provided under 19 U.S.C. § 1553 and its implementing regulations. While § 1592 might have offered the Government more latitude in formulating its theory of action, § 1553 and its regulations require much more specific proffers of proof. The CIT erred by not holding the Government to making the specific showings required by that statute and regulations.

## CONCLUSION

WHEREFORE, C.H. Robinson respectfully requests that this Court vacate and reverse the lower court's erroneous decision in this case.

Respectfully submitted,

 /s/ John M. Peterson
John M. Peterson
   *Counsel of Record*
Richard F. O'Neill
NEVILLE PETERSON LLP
17 State Street, 19th Floor
New York, NY 10004
Tel: (212) 635-2730
Fax: (212) 635-2734
jpeterson@npwny.com

April 17, 2013

43

Form 30

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on | Apr. 17, 2013 |
by:

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
    (by email or CM/ECF)

| Richard F. O'Neill | | /s/ Richard F. O'Neill |
Name of Counsel | Signature of Counsel

Law Firm | Neville Peterson LLP

Address | 17 State Street, 19th Floor

City, State, ZIP | New York, NY 10004

Telephone Number | (212) 635-2730

FAX Number | (212) 635-2734

E-mail Address | roneill@npwny.com

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

**Form 19**

**FORM 19.   Certificate of Compliance With Rule 32(a)**

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

☑     The brief contains [        *10629*        ] words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii), or

☐     The brief uses a monospaced typeface and contains [                    ] lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☐     The brief has been prepared in a proportionally spaced typeface using [        *Microsoft Word 2007*        ] in [        *Times New Roman (size 14)*        ], or

☐     The brief has been prepared in a monospaced typeface using [                    ] with [ [                    ].

/s/ Richard F. O'Neill
_____
(Signature of Attorney)

Richard F. O'Neill
_____
(Name of Attorney)

Counsel for Appellant
_____
(State whether representing appellant, appellee, etc.)

April 17, 2013
_____
(Date)

Reset Fields

142

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| UNITED STATES, | |
| Plaintiff, | |
| v. | |
| C.H. ROBINSON COMPANY, | |
| Defendant. | |

Before: Leo M. Gordon, Judge

Court No. 06-00434

## **JUDGMENT**

Upon consideration of the parties' joint status report, filed November 20, 2012, consistent with this Court's November 7, 2012 opinion, it is hereby

ORDERED, that this matter is decided, as set forth in the Court's November 7, 2012 opinion, and C.H. Robinson is liable for duties, taxes, and fees for the entries at issue in this case in the amount of $106,407.86 (to be offset by a previous $32,212 overpayment), plus pre-judgment interest and post-judgment interest on this amount, and FURTHER

ORDERED, that, in accordance with this Court's November 7, 2012 opinion and the parties November 20, 2012 joint status report, C.H. Robinson shall pay plaintiff the United States the amount of $100,799.34 (for the adjusted principal amount due and pre-judgment interest), plus any post-judgment interest, at a rate in accordance with 28 U.S.C. § 1961, on this $100,799.34, for the period from and including the date of this judgment through and including the date of payment.

/s/ Leo M. Gordon
Judge Leo M. Gordon

Dated:  November 20, 2012
New York, New York

Slip Op. 12-134

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| UNITED STATES,<br><br>                       Plaintiff,<br><br>      v.<br><br>C.H. ROBINSON COMPANY,<br><br>                    Defendant. | Before: Leo M. Gordon, Judge<br><br>Court No. 06-00434 |

**OPINION and ORDER**

[Defendant liable for unpaid duties.]

Dated: November 7, 2012

      Steven M. Mager and Shelley D. Weger, Trial Attorneys, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Plaintiff United States. With them on the brief were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel was Andrew Kosegi, Deputy Assistant Chief Counsel, U.S. Customs and Border Protection, of Indianapolis, IN.

      John M. Peterson and Richard F. O'Neill, Neville Peterson LLP, of New York, NY, argued for Defendant C.H. Robinson Company.

      Gordon, Judge: This opinion follows a bench trial. Plaintiff United States (the "Government") brought this action pursuant to Section 553 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1553 (2006)[1], and 19 C.F.R. § 18.8(c), to recover certain duties, taxes, and fees from Defendant C.H. Robinson Company ("C.H. Robinson"). The court has jurisdiction pursuant to 28 U.S.C. § 1582(3) (2006). For the reasons set forth

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2006 edition.

below, the court adjudges C.H. Robinson liable for the duties, taxes, and fees demanded by the United States.

## I. Background

This action involves the Government's claim that C.H. Robinson, a bonded carrier, owes duties, taxes, and fees accruing to the United States for three entries ("subject entries") of wearing apparel ("subject merchandise") from the People's Republic of China.  The subject entries were made as transportation and exportation entries, covering merchandise destined for Mexico after passing through the United States from the Port of Los Angeles, California to the Port of Laredo, Texas.

The vast majority of merchandise brought into the United States is entered by means of consumption entries by an importer of record.  A consumption entry requires that merchandise entered into the commerce of the United States meet several statutory and regulatory requirements, including the payment of duties owing upon the entered merchandise, unless the merchandise is subject to duty-free treatment.  See generally 19 U.S.C. § 1505.

As an exception to this general rule, Congress established that merchandise may be entered into the United States for the sole purpose of transporting such merchandise to a foreign port of destination.  In particular, "[a]ny merchandise . . . shown by the manifest, bill of lading, shipping receipt, or other document [such as a Customs Form 7512] to be destined to a foreign country, may be entered for transportation in bond through the United States by a bonded carrier without appraisement or the payment of duties and exported under such regulations as the Secretary of the Treasury shall prescribe."  19 U.S.C. § 1553(a).  A transportation and exportation entry ("T&E entry") is

the type of entry that is used when merchandise is transiting the United States for eventual export from the United States.  It is only when merchandise is being transported to a foreign destination and exported that duties are not owed.

Based on its clear statutory authority, U.S. Customs and Border Protection ("CBP") developed a broad regulatory scheme in which transportation and exportation entries would operate.  See 19 U.S.C. § 1553(a); see also 19 C.F.R. §§ 18.20-18.24 (2001).[2]  CBP's regulatory scheme for T&E entries is designed to ensure that merchandise destined to a foreign port of entry is, in fact, exported.  This scheme provides a multi-layered approach to overseeing such entries, including safeguards against non-compliance.  Among these safeguards is the provision found at 19 C.F.R. § 18.8(c), which requires that a "carrier shall pay any internal-revenue taxes, duties, or other taxes accruing to the United States on the missing merchandise, together with all costs, charges, and expenses caused by the failure to make the required transportation, report, and delivery."

The regulatory scheme also sets forth the timing of certain events regarding the transit of in-bond merchandise.  For example, bonded merchandise destined for export from the United States and transported by land is required to be delivered to CBP at the port of exportation within 30 days after the date of receipt by the forwarding carrier at the port of origin.  See 19 C.F.R. § 18.2(c)(2).  As a safeguard, if this requirement is not met, the regulation provides that failure to deliver the merchandise within the 30-day

---

[2] Further citations to the Code of Federal Regulations are to the relevant provisions of 2001 edition.

period constitutes an irregular delivery and the initial bonded carrier is subject to applicable civil penalties.  Id. (citing 19 CFR § 18.8).

Additionally, CBP's regulations require that "[p]romptly, but no more than 2 working days, after arrival of any portion of the in-bond shipment at the port of exportation, the delivering carrier shall surrender the in-bond manifest [CF 7512] to the port director as notice of arrival of the merchandise."  19 C.F.R. § 18.7(a).  This regulation also states that"[f]ailure to surrender the in-bond manifest or report the arrival of bonded merchandise within the prescribed period shall constitute an irregular delivery and the initial bonded carrier shall be subject to applicable penalties (see § 18.8)."  Id. (parenthetical in original).

Submission of a CF 7512 provides CBP with notice that the carrier has complied with the requirement of 19 C.F.R. § 18.2(c)(2) to deliver the merchandise to the port of exportation within 30 days of receipt.  It also commences the 20-day period for the carrier to notify CBP that the in-bond merchandise has not been entered.  See 19 C.F.R. § 4.37(b).  However, if the carrier chooses to enter, rather than export, the in-bond merchandise, the carrier must make that entry (for consumption, for additional movement by another carrier, or for entry into warehouse) within 20 days after arrival at the port of destination.  Id.

Pursuant to 19 C.F.R. § 18.7(b), "[t]he port director shall require only such supervision of the lading for exportation of merchandise covered by an entry or withdrawal for exportation or for transportation and exportation as is reasonably necessary to satisfy him that the merchandise has been laden on the exporting conveyance."  19 C.F.R. § 18.7(b).  In late 2001 and early 2002, the time of the subject

entries, CBP used a self-regulating process at the Port of Laredo in which CBP did not require (1) a carrier to report separately its arrival at the port of destination and the carrier's exportation of the merchandise, and (2) the supervised exportation of each T&E entry. Pl.'s Resp. to Def.'s Mot. In Limine, App. 29-30 (Dickinson Dec.), Jan. 8, 2010, ECF No. 71. Instead, at that time, CBP gave exporting carriers the benefit of the doubt that merchandise subject to a T&E entry was exported after having merely received notice of the merchandise's arrival at the port, unless such notice was called into question.

CBP is authorized to verify the presumption of exportation it granted an exporting carrier of a T&E entry. Pursuant to the procedures set forth in 19 C.F.R. § 18.7(c), "[w]henever the circumstances warrant, and occasionally in any event, port directors shall request the Office of Enforcement to check export entries . . . against the records of the exporting carriers. Such check or verification shall include an examination of the carrier's records of claims and settlement of export freight charges and any other records which may relate to the transaction. The exporting carrier shall maintain these records for 5 years from the date of exportation of the merchandise." 19 C.F.R. § 18.7(c)(emphasis added). A bonded carrier's failure to ensure exportation or other lawful disposition of T&E merchandise exposes the carrier to liabilities for any non-delivery at the port of exportation. See id. at §§ 18.7(c) and 18.8. Any non-delivery of T&E merchandise is "presumed to have occurred while the merchandise was in the possession of carrier, unless conclusive evidence to the contrary is produced." 19 C.F.R. § 18.8(a); see also Assessment of Liquidated Damages Under Carrier's Bonds, 47 Fed. Reg. 2,086-01, 2,087 (Dep't of Treasury Jan. 14, 1982) (final rule).

In addition to liability for payment of liquidated damages on the bond, the bonded carrier's liability covers "any internal-revenue taxes, duties, or other taxes accruing to the United States on the missing merchandise, together with all costs, charges, and expenses caused by the failure to make the required transportation, report, and delivery." 19 C.F.R. § 18.8(c).

Here, CBP conducted an audit under 19 C.F.R. § 18.7(c) to verify whether C.H. Robinson as the bonded carrier of the subject entries exported the subject merchandise. CBP concluded that C.H. Robinson could neither show that the subject merchandise was nor otherwise account for the merchandise's whereabouts. CBP therefore presumed that the merchandise remained in the United States and determined that non-delivery of T&E merchandise had occurred for which C.H. Robinson was responsible. Accordingly, CBP made a demand on C.H. Robinson, pursuant to 19 U.S.C. § 1553 and 19 C.F.R. § 18.8(c), for payment of $106,407.86, plus interest, for duties owed on the subject entries ("CBP's duty demand"). Joint Ex. 23. CBP's duty demand explained that C.H. Robinson owed duties on the subject entries because "C.H. Robinson failed to insure that the goods were exported to Mexico" and, "[c]onsequently, the quota/visa-restricted merchandise was diverted into the commerce of the United States, resulting in the loss of duties owed to the Government." Id. CBP's duty demand advised C.H. Robinson that "this demand may be protestable pursuant to 19 U.S.C. § 1514." Id. C.H. Robinson neither protested the demand nor paid the duties demanded. This action for collection of the unpaid duties ensued.

Prior to trial C.H. Robinson moved to dismiss this case as a matter of law, denying legal liability for any duties, taxes, or fees owed on the subject entries. Def.'s

Mot. to Dismiss, Mar. 30, 2007, ECF No. 19.  In support of its motion to dismiss, C.H. Robinson argued that its responsibility for the subject entries was fully discharged when the subject merchandise was delivered to the Port of Laredo, as evidenced by the CF 7512s stamped upon arrival at that port.  Id. at 7.  C.H. Robinson contended that "any event that occurred subsequent [to delivery in Laredo] is not actionable against the carrier."  Id.  In denying C.H. Robinson's motion the court ruled that as the bonded carrier of the subject entries, C.H. Robinson fulfilled its obligations under 19 C.F.R § 18.8 by providing acceptable proof of proper delivery of the subject merchandise at the Port of Laredo, i.e., by presenting date-stamped receipt copies of the subject CF 7512s.  See Order Denying Mot. to Dismiss at 3, Nov. 20, 2007, ECF No. 32. However, the court further held that C.H. Robinson not only had to certify proper delivery, but was also responsible under the regulatory scheme to account for "missing merchandise."  Id.

The court subsequently clarified that the Government has "the burden of persuasion to establish by a preponderance of the evidence that the subject merchandise is 'missing' within the meaning of the regulation, or more simply that the merchandise was not exported as required."  Order Denying Def.'s Mot. in Limine at 2 (citing Tech Licensing Corp. v. Videotek, Inc., 545 F.3d 1316, 1326-27 (Fed. Cir. 2008), Jan. 14, 2010, ECF No. 75.  Although there is a regulatory presumption that a date-stamped CF 7512 showing receipt of the in-bond manifest is acceptable proof of proper delivery, C.H. Robinson, as the bonded carrier, also had a duty to account for missing merchandise if audited under the verification procedures of 19 C.F.R. § 18.7.  Given these considerations, the court noted that the Government could not open its case in

chief "by simply resting with no proffer other than bare reliance on a regulatory requirement that Defendant account for missing merchandise." Id. at 3. Rather, the Government would have to rebut the presumption of proper delivery by proffering "as part of its case in chief evidence of the verification procedures undertaken pursuant to [the regulatory scheme] and their results that raised suspicions about the exportation of the merchandise, leading [the court] to conclude that [the merchandise] was not exported." Id. Depending on the efficacy of the Government's opening case, C.H. Robinson, in turn, would have to come forward with its own evidence and explanations to account for the potentially missing subject merchandise. A bench trial followed to determine whether the Government could establish by a preponderance of the evidence that the subject merchandise was missing and therefore never exported.

In an action tried upon the facts without a jury, "the court must find the facts specially and state its conclusions of law separately." USCIT R. 52(a)(1); see also 28 U.S.C. § 2645(a)(1). Based on the following findings of fact and conclusions of law, the court adjudges C.H. Robinson liable for duties, taxes, and fees on the subject merchandise in the amount of $106,407.86, plus interest.

## II. Discussion

### A. Findings of Fact

In late December 2001, Trans-Union Group Inc./Intercambio Comercial Ekim S.A. ("TUG"), the importer of record, entered the subject merchandise under cover of T&E entry numbers 609 203 744, 609 203 873, and 609 203 862 at the Port of Los Angeles. Joint Exs. 4-6. C.H. Robinson was designated by TUG as the bonded carrier for the subject entries. Tr. 457:24-459:8 (Munoz direct); Joint Ex. 3; see also Joint Exs.

4-6.  At TUG's request, C.H. Robinson was to transport the subject merchandise from the Port of Los Angeles for delivery to Intercambio Comercial Ekim SA/L.E. Forwarding & Freight Broker in Laredo, Texas[3] using Mario's Transports Inc. ("Mario's Transports"). Tr. 459:9-24; 471:18-22; 479:9-480:2 (Munoz direct); Joint Exs. 3-4, 7-11.  Shortly after entry, the subject merchandise exited the Port of Los Angeles for Laredo and then its ultimate destination of Nuevo Laredo, Mexico. Pretrial Order, Schedule C (Uncontested Facts) ¶¶ 3, 11, and 19; Joint Exs. 4-6.

TUG employed Mario Pena, Inc. ("Pena"), a licensed U.S. customs broker, to receive the subject merchandise in Laredo for exportation to Mexico. See Tr. 485:14-18 (Munoz cross); Joint Ex. 4.  Pena received the T&E documents - the CF 7512s - for the subject entries, and on January 2 and 4, 2002, using an unmonitored stamp machine in the lobby of CBP's export lot at the Port of Laredo, obtained a date stamp showing receipt of each of the three subject CF 7512s covering the subject entries. Tr. 273:5-18 (Mario Pena, Jr. direct); Joint Exs. 4-6.  Pena's official log book shows a record of receipt for the CF 7512s for the subject entries, but is blank for a corresponding date of exportation for each entry.  Joint Ex. 13; see Tr. 271:23-272:6 (Mario Pena, Jr. direct). Pena never brought the subject merchandise to the CBP export lot in Laredo, nor did Pena ever see, or take possession or delivery of the subject merchandise.  Tr. 273:5-14 (Mario Pena, Jr. direct).  Morever, CBP neither physically inspected nor took possession

---

[3] No entity by the name of Intercambio Comercial Ekim SA/ L.E. Forwarding & Freight Broker was authorized to receive bonded cargo during the time in question. Tr. 409:18-412:3 (Ingalls direct).

of the subject merchandise at the Port of Laredo.  Tr. 137:21-138:8 (Rodriguez direct);

Joint Exs. 4-6.

In March 2002, Officer O'Ruill David McCanlas ("Officer McCanlas") of CBP"s

Office of Investigations, Fraud and Commercial Crimes Unit commenced an audit of

C.H. Robinson, as the bonded carrier responsible for the subject entries, to ensure

compliance with CBP's procedures for T&E entries.  Tr. 25:10-24; 26:9-27:10; 41:21-

42:22 (McCanlas direct) and 51:17-20 (McCanlas cross).   In response to Officer

McCanlas' request for proof that the subject entries had been exported to Mexico,

C.H. Robinson produced a date-stamped receipt copy of the in-bond manifest – the

CF 7512 – for each of the subject entries.  Joint Exs. 4-6.  C.H. Robinson also obtained

from TUG and submitted to CBP three documents purporting to be Mexican import

documents, known as "pedimentos" ("the C.H. Robinson pedimentos" or "subject

pedimentos"), as proof of exportation of the subject entries.  Tr. 42:23-43:13 (McCanlas

direct) and 526:19-21 (Anderson re-direct); Pl.'s Exs. 9-11.

After receiving the subject pedimentos, Officer McCanlas contacted Jesus

Alberto Fernandez Wilburn ("Fernandez Wilburn"), Port Director at the Colombia

Solidarity Bridge for Mexican Customs, Nuevo Leon, Mexico, which shared operations

with the Port of Nuevo Laredo, requesting that Mexican Customs verify the authenticity

of the three subject pedimentos.   Tr. 44:20-45:9 (McCanlas direct); Pl.'s Ex. 15.

A search of Mexican Customs' electronic database revealed that the unique numbers

on each of the subject pedimentos did not match the numbers for any pedimento in

that database, nor was there any evidence of the existence of the subject pedimentos.

Tr. 328:10-329:10 (Fernandez Wilburn direct).  Moreover, the four digit broker code for

the customs broker listed on the subject <u>pedimentos</u> did not match the name of the customs broker associated with that code.  Tr. 329:20-331:2 (Fernandez Wilburn direct).  Lastly, the inspection stamps on each of the subject <u>pedimentos</u> indicated a road-check inspection in the interior of Mexico that pre-dated the purported date of entry of the subject merchandise into Mexico, Tr. 332:6-22 (Fernandez Wilburn direct), and pre-dated the date stamp signifying payment of Mexican import duties.  Tr. 335:6-14 (Fernandez Wilburn direct).

The court heard testimony from Rudolfo Torres Herrera ("Torres Herrera"), who served in various positions for Mexican Customs prior to his current appointment as the Assistant Commissioner for post imports.  He is well versed in the Mexican importation system, including the use of <u>pedimentos</u>, and was designated as an expert at trial.  Tr. 164:7-22 (Torres Herrera direct) and 206:20-207:14 (Torres Herrera direct).  He testified that on valid <u>pedimentos</u> inspection stamps must always post-date bank stamps because Mexican customs duties must be deposited with a bank prior to entry of merchandise into Mexico.  Tr. 184:14-21 (Torres Herrera direct).

Torres Herrrera also testified that, in September 2009, in response to another request from CBP to verify the validity of the subject <u>pedimentos</u>, he performed a detailed analysis of the information contained in those <u>pedimentos</u>.  Pl.'s Exs. 41-43.  A search of Mexican Customs' electronic database for information on the unique <u>pedimento</u> numbers corresponding to each of the subject <u>pedimentos</u> revealed no information regarding the numbers corresponding to these three <u>pedimentos</u>.  Tr. 179:13-180:2 (Torres Herrera direct).  A further search of the Mexican Customs' electronic database for the name and broker license number of the Mexican customs

broker listed on each of the pedimentos revealed that there was no broker in that database matching the name and broker license number set forth on the subject pedimentos. Tr. 181:16-182:2 (Torres Herrera direct). That search, however, did reveal that the customs broker license number provided on the subject pedimentos belonged to a customs broker other than the broker listed on those pedimentos. Tr. 182:2-6 (Torres Herrera direct). Moreover, the search revealed that the Mexican Customs' electronic database had no record of a relationship between the importing company listed on the subject pedimentos and either the named customs broker or the customs broker whose license number appeared on those pedimentos. Tr. 182:20-183:5 (Torres Herrera direct). The results of these searches confirmed the results of CBP's March 2002 inquiry.

The Torres Herrera investigation also showed that the tax identification number – a unique number assigned to all persons or entities doing business in Mexico – listed on the subject pedimentos for the Mexican customs broker was not in the Mexican electronic taxation database. Tr. 181:17-182:1; 183:6-184:5-7 (Torres Herrera direct). He thus concluded that the listed tax identification number was not valid. Id. The Torres Herrera investigation further revealed that the population registry number – a unique 18-digit number assigned to all Mexican nationals upon birth – listed for the Mexican customs broker on the subject pedimentos did not contain the required number of digits for population registry numbers and was identical to the tax identification number listed on the subject pedimentos. Tr. 183:7-184:7 (Torres Herrera direct). The investigation also demonstrated that the bank listed on the subject pedimentos as having received payment of the duties owed on the entries of the subject merchandise

did not engage in any transaction with the importing company listed on the subject <u>pedimentos</u>.   Tr. 184:8-185:11 (Torres Herrera direct).   Finally, Mexican Customs' electronic database did not contain any record of import transactions involving the importing company listed on the subject <u>pedimentos</u> during the period 2001-2002. Tr. 185:12-21 (Torres Herrera direct).

Torres Herrera also testified about the likelihood that cargo accompanied by the subject <u>pedimentos</u> could have passed legally through Mexican Customs into Mexico. According to Torres Herrera, all information listed on a <u>pedimento</u> is included in a bar code appearing at the center of the document, Tr. 169:18-170:8 (Torres Herrera direct), and all cargo entering Mexico must pass through a series of checkpoints where Mexican Customs visually examines each <u>pedimento</u> and the bar code is scanned for verification against Mexican Customs' electronic database.   Tr. 190:16-195:13 (Torres Herrera direct).   He indicated that there are three check points in the enclosed Mexican Customs' compound in the Port of Nuevo Laredo through which all truck cargo must pass upon crossing the U.S./Mexico border.   <u>Id.</u>   At the first inspection booth, a Mexican Customs official scans the bar code.   If the <u>pedimento</u> is not in Mexican Customs' electronic database, Mexican Customs would seize the subject merchandise. Tr. 191:13-24 (Torres Herrera direct).   At the second inspection booth, which is operated by a private company, the bar code is scanned again to verify the results of the first scan.   Tr. 191:25-193:25 (Torres Herrera direct).   If the <u>pedimento</u> is not in Mexican Customs' electronic database, the subject merchandise would be seized.   <u>Id.</u> At the third check point, the <u>pedimento</u> is visually inspected for a final time before cargo is permitted to leave the compound.   Tr. 194:2-19 (Torres Herrera direct).   Any

discrepancy or irregularity found in the <u>pedimento</u> during the three stage check-point process would lead to a physical inspection and/or seizure of the cargo, and all such inspections or seizures would be registered in Mexican Customs' electronic database. Tr. 191:13-194:14 (Torres Herrera direct); Tr. 341:12-16 (Fernandez Wilburn direct). In addition to the three check points at the Mexican Customs' compound in Nuevo Laredo, cargo traveling by road to the interior of Mexico is subject to a fourth check point located 20 kilometers from the U.S./Mexico border. At this fourth check point, operated by Mexican military, federal, and/or state police, each <u>pedimento</u> is examined and the bar code is again scanned. Tr. 194:12-19 (Torres Herrera direct). If any discrepancy is identified, the subject merchandise would be seized. Tr. 191:13-194:19 (Torres Herrera direct).

Torres Herrera testified that, in his experience, illegal entry (smuggling) of merchandise into Mexico is most often accomplished by using <u>pedimentos</u> that, unlike the subject <u>pedimentos</u>, are valid in all respects except for the listed country of origin. He testified that in those cases, but for the country of origin, the information contained on the face of the <u>pedimento</u> would match that found in the Mexican Customs' electronic database so as to minimize the risk of suspicion during the importation check-point process. Tr. 195:17-196:17 (Torres Herrera direct). Because the subject <u>pedimentos</u> contained numerous discrepancies that were unverifiable by a search of official Mexican electronic databases and because the subject <u>pedimentos</u> contained information whose falsity could have been ascertained by a visual inspection of a trained Mexican Customs official, Torres Herrera concluded that, in his expert opinion, the subject <u>pedimentos</u> were not valid Mexican import documents, Tr. 179:3-11 (Torres

Herrera direct), and that any cargo accompanied by these <u>pedimentos</u> could not have

passed into the territory of Mexico undetected by Mexican Customs.  Tr. 190:18-195:13

(Torres Herrera direct).  Accordingly, in his expert opinion, the merchandise purported

to have been imported into Mexico using the subject <u>pedimentos</u> never entered Mexico.

Tr. 189:24-190:15 (Torres Herrera direct).

Pursuant to the procedures in place in 2002, Mexican Customs would have

seized cargo whose <u>pedimentos</u> did not appear in Mexican Customs' electronic

database.  Tr. 341:12-16 (Fernandez Wilburn direct).  While there is no evidence of the

subject <u>pedimentos</u> in Mexican Customs' electronic customs database, Tr. 179:18-

180:2 (Torres Herrera direct) and 328:10-329:10 (Fernandez Wilburn direct), there is

also no record of a seizure of the subject merchandise by Mexican Customs.  <u>See</u> Pl.'s

Ex. 15; Tr. 58:14-59:3 (McCanlas cross) and 327:8-18 (Fernandez Wilburn direct).

In response to the Government's case in chief, C.H. Robinson relied on the three

date-stamped CF 7512s for the subject entries; the subject <u>pedimentos</u>; the driver hand

tags and freight bills for transport of the subject merchandise; and Pena's official log

book as evidence regarding the final disposition of the subject entries.  Pl.'s Exs. 19 and

22.  While C.H. Robinson demonstrated proof of delivery of the subject merchandise at

the Port of Laredo, in accordance with 19 C.F.R. § 18.8(c), by submitting the three date-

stamped CF 7512s, <u>see</u> Order Denying Mot. to Dismiss at 3, no information contained

on the face of the three CF 7512s provides any indication of the exportation or non-

exportation of the subject merchandise after its presumed arrival at the Port of Laredo,

<u>see</u> Joint Exs. 4-6; Tr. 32:19-33:9 (McCanlas direct) and 87:9-89:20 (Lopez direct).  The

same can be said for the driver hang tags and the freight bills for the transport of the

subject merchandise, Pl.'s Ex. 19; Tr. 90:2-92:23 (Lopez direct), and the official Pena

log book, Joint Ex. 13; Tr. 268:12-22; 272:14-24 (Mario Pena, Jr. direct).

Although C.H. Robinson made efforts to provide additional evidence of the

disposition of the subject merchandise after its purported arrival at the Port of Laredo,

those efforts proved to no avail.  In early November 2004, Gordon Anderson

("Anderson"), Vice President of C.H. Robinson's brokerage operations during the time in

question, sent an email message to Donald Munoz ("Munoz"), the account manager at

C.H. Robinson responsible for the subject entries.  Joint. Ex. 18.  In this email message,

Anderson asked Munoz to locate any records demonstrating that the subject

merchandise had been exported to Mexico.  Id.; Tr. 460:10-461:3 (Munoz direct).

C.H. Robinson's search for proof of export included attempts to locate "Customs

documents, financial receipts, Mexican carrier and or broker proof of export, paperwork

showing arrival into the plant in [M]exico, etc.[,] … documents from the truckers used[,]

[including] drivers log [and] other documentation showing delivery was made … [and]

any sort of financial trail, to include P.O.'s and method of payment and confirmation of

funds received by [the] customer for [the] transaction[,] [as well as] warehouse ledger

info, [and]  proof of delivery to receiving party … [and any information from the] party in

Mexico [who] was responsible for clearing Mexican Customs."  Joint Ex. 18.

C.H. Robinson's internal efforts failed to locate any such records or any other evidence

that the subject merchandise had left the territory of the United States.  Id.; Tr. 492:6-

493:22 (Munoz re-direct) and 526:19-21 (Anderson re-direct).

C.H. Robinson, through Munoz, contacted TUG to obtain additional proof of

exportation in 2004.  See Joint Ex. 18.  However, TUG never provided any proof (other

than the subject <u>pedimentos</u> at the time of the original transaction) to C.H. Robinson that the subject merchandise was exported to Mexico.  Joint Ex. 18; <u>see also</u> Tr. 491:17-20; 493:12-22 (Munoz re-direct).  C.H. Robinson was also unable to obtain a financial trail for the subject merchandise, such as purchase orders, methods of payment, confirmation of a funds transfer by TUG, information from a warehouse ledger showing that the subject merchandise had shipped, documentation from the Mexican customs broker, proof of delivery to the receiving party in Mexico or similar documentation, showing that the subject merchandise was received in their warehouse, nor was C.H. Robinson able to locate a record of any taxes or fees paid by TUG to its Mexican customs broker for services of clearing Mexican Customs.  Tr. 492:11-493:11 (Munoz re-direct).  C.H. Robinson also failed to present any evidence, including a driver's log from Mario's Transports, to demonstrate delivery of the subject merchandise in Mexico.  Lastly, C.H. Robinson presented no evidence demonstrating that, pursuant to Customs' regulations, another party relieved it of its responsibility to export the subject merchandise.  C.H. Robinson never replaced or cancelled the subject entries with immediate exportation or consumption entries.  Pretrial Order, Schedule C, Uncontested Facts ¶¶ 8, 16, & 24.

The court notes that, throughout the five-year history of this litigation up through the time of trial, C.H. Robinson had proferred the subject <u>pedimentos</u> (obtained from TUG) as proof of exportation.  At trial, however, C.H. Robinson conceded that the subject <u>pedimentos</u> were not genuine documents and could not be verified in Mexican Customs' electronic database.  Tr. 18:18-19:24 (Peterson opening statement); <u>see also</u> Def.'s Proposed Concls. of L. ¶ 20 ("C.H. Robinson does not deny that the <u>pedimentos</u>

were not genuine.") and ¶ 35 ("[T]he invalid <u>pedimentos</u> which C.H. Robinson presented

to Customs did not constitute acceptable proof of exportation . . . ."). At that point,

C.H. Robinson sought to create an inference that the subject merchandise was

smuggled into Mexico. Tr. 19:6-16 (Peterson opening statement). Despite its efforts,

C.H. Robinson presented no evidence (direct or circumstantial) that would lead to the

inference that the subject merchandise was smuggled into Mexico. To the contrary, the

subject <u>pedimentos</u>, in the expert opinion of Torres Herrera, were more likely than not

evidence of diversion of the subject merchandise into the commerce of the United

States rather than evidence of smuggling into Mexico. Tr. 201:19-24 (Torres Herrera

direct). Critically, the disposition of the subject merchandise after its purported arrival at

the Port of Laredo remains unknown to C.H. Robinson, and C.H. Robinson presented

no evidence nor anyone with personal knowledge of the whereabouts of the subject

merchandise.

There is no direct evidence as to the whereabouts of the subject merchandise.

However, the Government presented documentary evidence and the credible testimony

of several lay witnesses, including Officer McCanlas and Fernandez Wilburn, along with

the credible testimony of its expert, Torres Herrera, that allows the court to draw a

reasonable, if not strong, inference that the subject <u>pedimentos</u> were not valid Mexican

import documents, a fact ultimately conceded by C.H. Robinson. The record before the

court and the credible testimony of these witnesses, in particular that of Torres Herrera,

further allows the inference that the subject merchandise could not have been imported

into Mexico using the subject <u>pedimentos</u>. Those <u>pedimentos</u> would not have been

validated by an inspection of Mexican Customs' electronic database and would not have

passed visual scrutiny by Mexican Customs officials.  Therefore, the court finds that the subject merchandise is missing.

Additionally, the documentation that C.H. Robinson provided during the audit process to CBP, as well as at trial, did not establish (a) exportation out of the United States, (b) entry into the commerce of the United States along with payment of duties, (c) warehousing, or (d) transfer to another carrier for exportation of the subject merchandise.  The record before the court and, in particular, the credible testimony of Defendant's two witnesses, Anderson and Munoz, further demonstrates C.H. Robinson's inability to proffer, no less obtain evidence (other than the date-stamped CF 7512s and the subject false <u>pedimentos</u>) that accounts for the subject merchandise.  Therefore, the court finds C.H. Robinson was unable to account for that merchandise in accordance with 19 C.F.R. § 18.8(a).

## B. Conclusions of Law

As explained above, merchandise seeking to pass through U.S. ports for export without appraisement or payment of duty is entered at the port of arrival under cover of a T&E entry.  <u>See</u> 19 C.F.R. § 18.20(a).  The statutory and regulatory framework imposes various responsibilities and deadlines for the handling of a T&E entry.  Among them, T&E merchandise must be transported from the port of arrival by a bonded carrier, 19 U.S.C. § 1553(a); 19 C.F.R. § 18.20(a), and must be delivered to CBP at the port of destination within 30 days of receipt by the bonded carrier at the port of arrival (if transported on land).  19 C.F.R. § 18.2(c)(2).  Within no more than two working days after arrival of any portion of the merchandise at the port of destination, the bonded carrier must notify CBP of such arrival by surrendering the in-bond manifest (CF 7512).

19 C.F.R. §§ 18.2(d) and 18.7(a).  The final disposition of the merchandise – either exportation or official entry into U.S. commerce or warehouse – must then be effected within 20 days of the notice of arrival.  <u>See</u> 19 C.F.R. § 4.37(b).  A bonded carrier's failure to comply with any of these procedures exposes the carrier to the liabilities set forth in 19 C.F.R. § 18.8.  <u>See</u> 19 C.F.R. §§ 18.2(c)(2), 18.2(d), 18.7(a), and 18.8(a); <u>see also</u> <u>id.</u> at § 4.37(b).

Additionally, a bonded carrier responsible for a T&E entry is subject to post-exportation audit by CBP "[w]henever the circumstances warrant, and occasionally in any event."  19 C.F.R. § 18.7(c).  Post-exportation audits are designed to "check export entries and withdrawals against the records of the exporting carriers" and "shall include an examination of the carrier's records of claims and settlement of export freight charges and any other records which may relate to the transaction."  <u>Id.</u>

When CBP determines that merchandise covered by a T&E entry is missing or unaccounted for, the non-delivery is 'presumed to have occurred while in the carrier's possession, and therefore, the carrier is treated by [CBP] as being responsible for that loss [such that CBP] will collect from the carrier duty on the missing merchandise." <u>Assessment of Liquidated Damages Under Carrier's Bonds</u>, 47 Fed. Reg. 2,087.

A bonded carrier's liabilities for any missing T&E merchandise include liquidated damages on the bond, 19 C.F.R. § 18.8(b), as well as "any internal-revenue taxes, duties, or other taxes accruing to the United States on the missing merchandise."  <u>Id.</u> at § 18.8(c).  When audited pursuant to 19 C.F.R. § 18.7, a bonded carrier's failure to account for the exportation of merchandise covered by a T&E entry is a legally sufficient basis for the imposition of duties under 19 C.F.R. § 18.8(c).  <u>See</u> 19 C.F.R. §§ 18.7(c)

and 18.8(c); Order Denying Mot. to Dismiss at 3.  The Government may collect duties

pursuant to 19 U.S.C. § 1592(d), or alternatively under 19 U.S.C. § 1553 and 19 C.F.R.

§ 18.8(c).  Order Denying Mot. to Dismiss at 2-3.

The allocation of legal responsibility for the subject entries in this action is

governed by the regulatory framework applicable to a T&E entry.  See Joint Exs. 4-6;

see also Joint Ex. 13.  Against this framework, each subject date-stamped CF 7512

showing receipt of the in-bond manifest enjoys a presumption that it is proof of proper

delivery of the subject merchandise by C.H. Robinson.  Order Denying Def.'s Mot. in

Limine at 3.  However, C.H. Robinson's obligations under 19 C.F.R. § 18.8(c) go

beyond the certification of proper delivery of the merchandise covered by the subject

entries to include a responsibility to account for missing merchandise.  Order Denying

Mot. to Dismiss at 3.  Despite C.H. Robinson's arguments to the contrary, there is no

statute or regulation that imposes a burden on the Government to search for or

establish the location of missing merchandise.

As the bonded carrier responsible for the subject entries, C.H. Robinson, has a duty to

ensure that the subject merchandise was timely exported out of the United States or

lawfully entered into U.S. commerce or warehouse.  See Order Denying Def.'s Mot. to

Dismiss; see also 19 U.S.C. § 1553(a); 19 C.F.R. §§ 18.7(c) (providing for audit of

"exporting carriers" (emphasis added)) and 18.8(a)).  Had C.H. Robinson wanted to

expose itself only to liability for transporting the subject merchandise from one port to

another, without needing to ensure the proper exportation of the merchandise, it could

have done so by using an immediate transportation without appraisement entry.  See

19 U.S.C. § 1552; 19 C.F.R. §§ 18.11-18.12.  Before delivering the merchandise to

Court No. 06-00434                                                                          Page 22

another carrier for exportation, C.H. Robinson could then have ensured that the new

carrier filed an Entry for Exportation, <u>see</u> 19 C.F.R. §18.25, making the new carrier

liable in the event that the new carrier failed to export the merchandise. Alternatively,

C.H. Robinson could have had the merchandise entered into a warehouse or for

consumption. <u>See</u> 19 C.F.R. § 18.23(b). C.H. Robinson chose none of these options.

Rather, by permitting itself to remain the carrier of the subject merchandise entered

under a T&E entry, it would seem obvious that C.H. Robinson was responsible for

ensuring the exportation of the subject merchandise. It is equally obvious that by failing

to do so C.H. Robinson made itself liable for any violations that may have occurred

relating to the exportation of that merchandise.

      To recover taxes, duties, and fees accruing to the United States, the Government

bears the burden to prove, by a preponderance of the evidence, that the subject

merchandise is "missing." Order Denying Def.'s Mot. <u>in Limine</u>. Proof by a

preponderance of the evidence requires the court, as the trier of fact, "to believe that the

existence of a fact is more probable than its nonexistence." <u>Bosies v. Benedict</u>, 27 F.3d

539, 542 (Fed. Cir. 1994) (citing <u>In re Winship</u>, 397 U.S. 358, 371-72 (1970) (Harlan, J.,

concurring)).

      In this action the Government has established that the subject merchandise is

missing, and C.H. Robinson, in turn, has failed to account for that missing subject

merchandise. The court concludes on the record before it that it is more probable than

not that the subject merchandise was not exported, as required by statute and

regulation. Consequently, pursuant to 19 U.S.C. § 1553 and 19 C.F.R. § 18.8(c),

C.H. Robinson is liable for "any internal-revenue taxes, duties, or other taxes accruing to the United States" on the missing subject merchandise in the amount of $106,407.86.

### III. Conclusion

For the foregoing reasons, the Government has established that C.H. Robinson did not export or otherwise account for the subject merchandise and that the Government is therefore entitled to a judgment for unpaid duties on the subject entries in the amount of $106.407.86, plus interest.  In early March 2004, C.H. Robinson paid CBP $57,212 as settlement of the liquidated damages claims related to the subject entries.  Comp. ¶ 15.  Subsequently, the Government admitted that the maximum amount of liquidated damages owed by C.H. Robinson was capped at the amount of the bond on the subject entries, i.e., $25,000.  Id. at ¶ 18; see also C.H. Robinson Int'l v. United States, 64 Fed. Cl. 651, 660 (2005)  Consequently, in seeking its requested relief, the Government acknowledges that a judgment in its favor should be offset by any overpayment in liquidated damages by C.H. Robinson on those entries.  Comp. at Prayer for Relief.

Additionally, the Government seeks pre-judgment interest on the unpaid duties. The award of pre-judgment interest is within the sound discretion of the court based on considerations of equity and fairness.   See United States v. Imperial Food Imports, 834 F.2d 1013, 1016 (Fed. Cir. 1987) (citing United States v. Goodman, 6 CIT 132, 140-41, 572 F. Supp. 1284, 1290 (1983)).  The purpose behind pre-judgment interest is to make the Government whole by reimbursing it for what in effect amounts to an interest-free loan to Defendant.  Id.  Pre-judgment interest shall run from the date of Customs' final demand for payment, September 21, 2006, to the date of judgment, see United States

v. Yuchius Morality Co., 26 CIT 1224, 1240-41 (2002), at the rate provided in 28 U.S.C. § 2644 and in accordance with 26 U.S.C. § 6621, see United States v. Golden Gate Petroleum Co., 30 CIT 174, 182-83 (2006) (citing Goodman, 6 CIT at 140, 572 F. Supp. at 1290).    In this action, there has been no unreasonable delay on the part of the Government, and therefore, equity favors awarding the Government pre-judgment interest to compensate the Government for the loss of use of the unpaid duties.  Finally, the Government is awarded post-judgment interest based on the same considerations of equity and fairness and shall be calculated at a rate in accordance with 28 U.S.C. § 1961.  See Golden Gate Petroleum, 30 CIT at 183 n.9 (citing Goodman, 6 CIT at 140-41, 572 F. Supp. at 1290).  Accordingly, the parties are hereby

    **ORDERED** to file, on or before November 20, 2012, a joint proposed judgment in conformity with this opinion taking into account any overpayment in liquidated damages by C.H. Robinson on the subject entries; and it is further

    **ORDERED** that if the parties are unable to reach agreement on a joint proposed judgment, each party shall file its own proposed judgment on or before November 20, 2012.


                                                    /s/ Leo M. Gordon
                                                 Judge Leo M. Gordon


Dated: November 7, 2012
          New York, New York